# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-41623

United States Court of Appeals
Fifth Circuit

**FILED**

February 3, 2017

Lyle W. Cayce
Clerk

United States of America, ex rel, DAVID R. VAVRA, et al

Plaintiffs

UNITED STATES OF AMERICA,

Intervenor - Appellee

v.

KELLOGG BROWN & ROOT, INCORPORATED,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, BARKSDALE, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Federal law prohibits kickbacks in connection with Government contracts. In this civil-enforcement action, the Government alleged that Kellogg Brown & Root was liable for kickbacks knowingly accepted by two of its employees. The district court agreed with the Government after imputing the knowledge of those two employees to the company. We AFFIRM the liability arising from one employee, REVERSE as to the other, and REMAND.

No. 15-41623

## FACTUAL AND PROCEDURAL BACKGROUND

Today's appeal is this litigation's second journey to this court. Our 2013 opinion comprehensively discussed the facts. *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 344–45 (5th Cir. 2013). We restate only a few key matters relevant to this appeal.

Kellogg Brown & Root ("KBR") provided global logistical support to the United States Army under a Government contract executed in 2001 known as Logistics Civil Augmentation Program III ("LOGCAP III"). Under the contract, the Army would issue various task orders which KBR could fulfill either on its own or through subcontractors. Relevant here, KBR subcontracted with EGL, Inc., to perform freight forwarding services.

In January 2004, the relators filed a *qui tam* action against KBR and EGL, among others, for multiple False Claims Act ("FCA") violations, some of which involved kickbacks. It was not until more than six years later, in August 2010, that the Government intervened and filed its own complaint. In addition to FCA claims, it alleged that KBR, through its employees, knowingly engaged in kickbacks in violation of 41 U.S.C. §§ 8701–07 (the "Anti-Kickback Act" or the "AKA"). The district court dismissed the Government's AKA claim, holding the employees' acts could not be imputed to KBR because the Government had failed to make sufficient allegations that they were acting for KBR's benefit.

We reversed and remanded, holding the district court applied the wrong standard of vicarious liability and thus improperly concluded the Government had failed to state a claim. *Vavra*, 727 F.3d at 353–54. On remand, the district court conducted a bench trial and found that two of KBR's employees, Robert and James Bennett, knowingly accepted kickbacks in connection with LOGCAP III. The court then held KBR liable under Section 8706(a)(1) for knowingly accepting kickbacks. KBR appealed.

2

No. 15-41623

DISCUSSION

We begin with a summary of the AKA.  The Act prohibits providing kickbacks, soliciting kickbacks, or including kickbacks in contract prices so that the costs of such kickbacks are passed on to the Government. 41 U.S.C. § 8702.  Most relevant here, a "kickback" is "any . . . gratuity, thing of value, or compensation of any kind that is provided to a . . . prime contractor employee . . . to improperly obtain or reward favorable treatment in connection with a . . . subcontract relating to a prime contract."  *Id.* § 8701(2).  The Government can enforce this prohibition through civil or criminal enforcement, or both.  *Id.* §§ 8706–07.

This case deals with the civil-enforcement provision, Section 8706, which gives the Government two options.  The first, Section 8706(a)(1), permits recovery of a civil penalty equal to "twice the amount of each kickback involved in the violation" plus up to $11,000 per kickback,  but only if the Government can show that a person "knowingly engage[d] in conduct prohibited by section 8702," the conduct being kickbacks.  *Id.* § 8706(a)(1); *see also Vavra*, 727 F.3d at 347 n.6 (explaining the $11,000 figure).  The second, Section 8706(a)(2), dispenses with the knowledge requirement and permits recovery "from a person . . . whose employee, subcontractor, or subcontractor employee violates section 8702 . . . ."  *Id.* § 8706(a)(2).  Section 8706(a)(2) permits the Government to recover "a civil penalty equal to the amount of [the] kickback." *Id.*  Here, the Government alleged only a violation of Section 8706(a)(1).

KBR raises three issues on appeal, all of which are ones of first impression.  First, did the district court apply the proper standard for imputing knowledge under the AKA?  Second, does the AKA require proof of a connection between the alleged kickback and a specific instance of favorable treatment? Third, does the Government's AKA claim relate back to the relators' *qui tam* complaint under 31 U.S.C. § 3731(c)?  We separately address each issue.

3

No. 15-41623

*I.     Imputing Knowledge Under the AKA*

The first issue is whether the knowledge of the two men who received kickbacks can be imputed to KBR so as to subject the company to heightened liability under Section 8706(a)(1). Three potential knowledge-imputation standards are proposed by the parties' briefing and the history of this case. First, the Government cites our prior opinion in this case to argue that, to impute knowledge from employees to their employer, it need only show the employees had apparent authority. *See Vavra*, 727 F.3d at 348–49. Second, KBR urges us to insert into the AKA context our standard for knowledge imputation under the Limited Liability Act. There we evaluate eight non-exhaustive factors. *See In re Hellenic, Inc.*, 252 F.3d 391, 397 (5th Cir. 2001). Third, the district court adopted an intermediate standard applying corporate-law principles, which was articulated by Judge Jolly in his separate opinion in the 2013 appeal. *See Vavra*, 727 F.3d at 356 (Jolly, J., concurring).

We start by noting the scope of our first opinion. We addressed the standard for holding a corporation vicariously liable under the AKA. *Vavra*, 727 F.3d at 348–49. We held that the AKA, like the common law, imposes "vicarious liability for employee actions taken under apparent authority." *Id.* at 352. No explanation of "what 'knowingly' entails" in Section 8706(a)(1) was provided, as that was a "nuanced" and "fact-reliant" inquiry "unsuited for resolution at the motion to dismiss stage." *Id.* at 349. Thus, even though we held that apparent authority was the standard for whether vicarious liability existed, "we ma[de] no determination as to the knowledge requirement of [the] statute." *Id.* That determination is now needed.

Judge Jolly argued that the knowledge requirement under Section 8706(a)(1) should be applied. *Id.* at 354–55 (Jolly, J., concurring). Section 8706(a)(1), "properly construed, . . . holds corporations liable only for the knowing violations of those employees whose authority, responsibility, or

4

managerial role within the corporation is such that their knowledge is imputable to the corporation." *Id.* at 355. If apparent authority were the entirety of the test under Section 8706(a)(1), "that provision would impose liability identical to [Section 8706(a)(2)]: an employee who is bribed will always have apparent authority — it would be nonsensical to give a kickback to an employee who lacked the apparent authority to accomplish its object." *Id.* at 356.[1] Judge Jolly concluded, therefore, that Section 8706(a)(1) "permits the government to attribute liability to corporate defendants vicariously in cases where the knowledge of the employees is imputable to the corporation." *Id.* But because the case was still at the motion-to-dismiss stage, he recognized that the district court would need to further develop the record to make the required knowledge determination. *Id.* On remand, the district court adopted Judge Jolly's proposed knowledge-imputation standard.

Before addressing each of the proposed standards, we frame the question we seek to answer. As the Government argues, we generally apply common-law principles of vicarious liability to legislatively created tort actions such as those created by Section 8706(a). *See id.* at 349 (majority op.). A corporation cannot act or have a mental state by itself, and thus, under the common law, "the acts and mental states of its agents and employees will be imputed to the corporation where such natural persons acted on behalf of the corporation." *Id.* at 348 (quoting 10 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 4877 (2012 ed.)). It does not follow, however, that the knowledge of any agent can be deemed the knowledge of the corporation: under the common law, only "[k]nowledge of the proper corporate

---

[1] It has been said that a third party must "reasonably believe" the actor has authority. RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. d (2006). Unreasonable decisions may be made at times by prospective kickbackers. We thus do not hold that a bribed employee will always have apparent authority. The potential for kickbacker error, though, does not undermine the basic point of Judge Jolly's analysis.

agent must be regarded, in legal effect, as the knowledge of the corporation." *See* FLETCHER § 787. The relevant question, then, is *whose* knowledge may be imputed to a corporation under the AKA. That decision "tends to be fact-intensive and contingent upon the specific legal regimes involved." *Hellenic*, 252 F.3d at 395. The specific regime here is the AKA.

First, apparent authority alone cannot be sufficient to impute an employee's knowledge to the employer. As noted, the AKA contains two provisions by which the Government can obtain civil penalties for kickback violations: Section 8706(a)(1), which allows recovery if a person "knowingly engages in" kickback activity; and Section 8706(a)(2), which allows recovery "from a person . . . whose employee" engages in kickback activity. These provisions are distinct and give the Government separate enforcement options. The first distinction is the knowledge requirement. The second is that Section 8706(a)(2)'s plain text permits the Government to recover from a corporation for the acts of its employees only "a civil penalty equal to the amount of [the] kickback," whereas Section 8706(a)(1) permits recovery of twice the amount of each kickback plus $11,000 for each occurrence of prohibited conduct. Of course, "it is entirely consistent for the statute to punish knowing violations more severely than those of which the corporation was unaware." *Vavra*, 727 F.3d at 348 (majority op.) (quotation marks and alterations omitted).

An apparent-authority-only standard frustrates these deliberate distinctions, textually and practically. Textually, requiring only apparent authority would pluck "knowingly" from the statutory text and eliminate any difference between the Government's burdens under Sections 8706(a)(1) and (a)(2). That is, an employee who receives a kickback will almost always have apparent authority because "it would be nonsensical to give a kickback to an employee who lacked the apparent authority to accomplish its object"; requiring only apparent authority to impute an employee's knowledge under

Section 8706(a)(1) would render it indistinguishable from Section 8706(a)(2). *Id.* at 356 (Jolly, J., concurring). The definition of kickback is illustrative: it includes only conduct "to improperly obtain or reward favorable treatment . . . ." *See* 41 U.S.C. § 8701(2).

For this reason, the practical results of adopting an apparent-authority standard would be unusual. The Government would have no reason to prove a kickback occurred under Section 8706(a)(2) because its burden would be the same under Section 8706(a)(1), but that section provides for significantly higher civil penalties than its counterpart. We presume "that statutory language is not superfluous," and therefore we decline to make Section 8706(a)(1)'s knowledge requirement meaningless. *See Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 299 n.1 (2006).

The Government argues we can adopt its reading without causing superfluity. Section 8706(a)(2), it says, merely "permits the government to recover even from those in the contracting chain who unwittingly pass along kickback-tainted charges." The counterpoint, though, is that "because we can assume a person who is being bribed always knows he is being bribed, the knowledge requirement would not add to [Section 8706(a)(2)] if it applied to employees rather than to the corporation itself." *See Vavra*, 727 F.3d at 354 n.1 (Jolly, J., concurring). The "legal regimes involved," and specifically the language used by Congress in Section 8706(a), forecloses the Government's broad interpretation. *See Hellenic*, 252 F.3d at 395.

We also conclude that the AKA does not warrant the knowledge-imputation standard urged by KBR, which is the *Hellenic* standard. That case dealt with the Limited Liability Act ("LLA"), which "allows a vessel owner to limit its liability for any loss or injury caused by the vessel to the value of the vessel and its freight" if the owner is "without privity or knowledge of the cause of the loss." *Id.* at 394 (quotation marks omitted). Under the LLA, the relevant

No. 15-41623

knowledge-imputation question is whether an employee is a "managing agent with respect to the field of operations in which the negligence occurred." *Id.* at 396. To answer that question, *Hellenic* directed courts to consider eight non-exhaustive factors:

> (1) [T]he scope of the agent's authority over day-to-day activity in the relevant field of operations; (2) the relative significance of this field of operations to the business of the corporation; (3) the agent's ability to hire or fire other employees; (4) his power to negotiate and enter into contracts on behalf of the company; (5) his authority to set prices; (6) the agent's authority over the payment of expenses; (7) whether the agent's salary is fixed or contingent; and (8) the duration of his authority (i.e., full-time or restricted to a specific shift).

*Id.* at 397.

These factors reflect agency law only "unevenly" through the lens of the LLA. *See id.* at 395. Part of the unevenness is that the LLA, unlike the AKA, was enacted "in derogation of the common law" to limit liability, not create it. *See The Main v. Williams*, 152 U.S. 122, 133 (1894); *see also Hellenic*, 252 F.3d at 395–96. More importantly, *Hellenic* recognized that "the limited liability doctrine is also sensitive to the scope of an owner's control over his agents." 252 F.3d at 396. Under the LLA, therefore, we require a considerable degree of authority before imputing the knowledge of the employee to the owner: "When the owner is so far removed from the vessel that he can exert no control over the master's conduct, he should not be held to the master's negligence." *Id.* This restraint makes sense in context. *Hellenic* was clear that when "a corporation grants its agents significant discretion and autonomy, it is reasonable to deny limitation . . . ." *Id.* We have never held that the knowledge-imputation standard under the LLA controls outside that context. We do not start today.

Even so, we find the principles discussed in *Hellenic* helpful because they reflect common-law corporate principles. Such principles tell us that "a court

may deem only the knowledge of officers and employees at a certain level of responsibility imputable to the corporation." FLETCHER § 790. Although "knowledge of agents who are not officers may be imputed to the corporation[,] . . . [k]nowledge of a mere employee of the corporation ordinarily is not imputed to the company." *Id.* § 807. "Whether an individual's knowledge will be imputed to the corporation depends on a factual determination, according to the particular circumstances, of the individual's position in the corporate hierarchy," which includes asking if the "employee has sufficient responsibility or authority to impute his knowledge to the corporation . . . ." *Id.*

These common-law principles fit comfortably within Section 8706(a)'s two-tiered liability structure and give meaning to "knowingly" as used in Section 8706(a)(1). Adopting such principles is also consistent with our understanding that Congress incorporated common-law vicarious liability rules into the AKA. *See Vavra*, 727 F.3d at 348.

To be clear, the precise question being asked is whether "a person," *i.e.,* a corporation, itself has knowledge, not merely whether one of its agents has knowledge. *See id.* at 354 n.1 (Jolly, J., concurring). Answering which agent's knowledge is the corporation's knowledge is the linchpin. This analysis will usually involve "developing the evidence, both factual and expert, regarding the employees' job titles, their actual responsibilities, and their overall place within the company." *Id.* at 356. The goal is to determine whether an employee's knowledge may be fairly imputed to the corporation. "Where the level of responsibility begins must be discerned from the circumstances of each case." *Cf. Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983). Although we do not adopt wholesale the "managing agent" test from the LLA, its focus on the agent's authority "over the sphere of activities in question" is helpful. *See In re Signal Int'l, LLC*, 579 F.3d 478, 496–97 (5th Cir. 2009) (quoting *In re Kristie Leigh Enters.*, 72 F.3d 479, 481 (5th Cir. 1996)).

No. 15-41623

We hold that the proper test for imputing knowledge under Section 8706(a)(1) is that corporations are liable "only for the knowing violations of those employees whose authority, responsibility, or managerial role within the corporation is such that their knowledge is imputable to the corporation." *Vavra*, 727 F.3d at 355 (Jolly, J., concurring).

We now turn to the district court's findings and conclusions. When reviewing a bench trial, findings of fact are reviewed for clear error and legal issues are reviewed de novo. *Meche v. Doucet*, 777 F.3d 237, 241–42 (5th Cir. 2015). The district court predicted correctly that it should adopt the standard proposed by Judge Jolly. The court found Robert Bennett was responsible for supervising the EGL subcontract, including both general performance and day-to-day operations; for ensuring EGL met its obligations; for communicating with EGL on any performance issues; and for reviewing EGL invoices and submitting them for payment. He was also "part of a collaborative process to determine whether to exercise options under the EGL subcontract and to execute technical evaluations for rebidding the freight forwarding subcontract." Consequently, the court found Robert Bennett possessed sufficient authority and responsibility to impute his knowledge to KBR. This finding is not clearly erroneous. Although he was neither an executive nor particularly high on KBR's corporate ladder, the evidence supports the district court's finding that he worked in a supervisory capacity as to the EGL subcontract. In other words, he had somewhat significant managerial authority "over the sphere of activities in question." *See Signal Int'l*, 579 F.3d at 496. KBR tasked him with such authority, thus permitting a conclusion that his knowledge may be fairly imputed to KBR. Given such evidence, the record does not support a "definite and firm conviction that a mistake has been committed." *See Barto v. Shore Constr., L.L.C.*, 801 F.3d 465, 471 (5th Cir. 2015).

No. 15-41623

As to James Bennett, the district court found that KBR tasked him with evaluating and awarding the EGL subcontract, in addition to his responsibility for awarding and administering other subcontracts for KBR.  It also noted that he had signature authority in the amount of $250,000, as well as the authority to award subcontracts in connection with LOGCAP III.  Accordingly, the district court held that James Bennett's "significant responsibility supports a finding that [his] knowledge may be imputed to KBR."  We see this Bennett's authority differently.  Although he had some authority within KBR as to the initial award of the EGL subcontract,[2] he had almost no further involvement or authority with respect to LOGCAP III.  He did not, for example, work on the EGL subcontract during the relevant period and lacked the authority to "take *any* procurement action regarding . . . LOGCAP III."  At one point, James Bennett may have had authority as to the EGL subcontract.  During the relevant period, though, he was not in a position in which his "authority, responsibility, or managerial role" would fairly permit imputation of his knowledge to KBR.  *See Vavra*, 727 F.3d at 355 (Jolly, J., concurring).  Thus, the record — and indeed the district court's other findings — undermine the district court's finding that James Bennett's limited authority was sufficient to impute his knowledge to KBR.  We hold such finding was clearly erroneous.

## II.    *Meaning of "Kickback"*

The parties next argue about the meaning of "kickback" under the AKA. We first analyze whether the Government is correct that the issue was not preserved.  Generally, "arguments not raised in the district court cannot be

---

[2] The district court found that James Bennett had $250,000 signature authority, which contributed to it finding his knowledge imputable to KBR.  In light of the other record evidence indicating that other KBR employees had significantly more signature authority, this relatively low signature authority seems to indicate limited rather than significant authority.  *See Hellenic*, 252 F.3d at 397.

asserted for the first time on appeal." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 427 n.29 (5th Cir. 2002). Conversely, we will consider an issue "if the argument on the issue before the district court was sufficient to permit the district court to rule on it." *Id.* There is no "bright-line rule," but to preserve its argument for appeal, the "litigant must press and not merely intimate the argument" before the district court. *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 n.4 (5th Cir. 1996) (quotation marks omitted).

The district court here had the opportunity to rule on this issue, and it did. KBR "pressed" that a "kickback" required a connection between the gratuity and specific favorable treatment while opposing the Government's motion for partial summary judgment. The argument "was sufficient to permit the district court to rule on it." *See Liljeberg*, 304 F.3d at 427 n.29. Though the district court did not address KBR's argument head-on, it definitively ruled against KBR by finding there was "no issue of material fact with respect to whether [Robert] Bennett accepted a kickback in violation of the AKA." Later, in KBR's proposed conclusions of law, it referenced the district court's prior ruling and asked the court to reconsider, noting that "[o]ther federal bribery and gratuity statutes require some indicia that the recipient understood that the gift was offered in exchange for a specific act." KBR's argument in the district court was sufficient to preserve the issue for appeal.

We now turn to the merits. The AKA defines a "kickback" as

any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee *to improperly obtain or reward favorable treatment* in connection with a prime contract or a subcontract relating to a prime contract.

41 U.S.C. § 8701(2) (emphasis added). KBR does not contest that gratuities were exchanged "in connection with a prime contract." Rather, the dispute we now examine hinges on the italicized phrase "to improperly obtain or reward

favorable treatment." Specifically, the issue is whether such language requires a connection between the gratuity and the "favorable treatment" sought to be obtained or rewarded. KBR contends it does, relying on the Supreme Court's federal-bribery-statute jurisprudence. *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999).[3] The district court held otherwise. It required the Government to prove only "that the reason one person provided something of value to another was to improperly influence a procurement decision."

We first summarize what is needed under the provision of the federal bribery statute prohibiting illegal gratuities. The Government must show that something of value was given, offered, or promised to a public official, or demanded, sought, received, accepted, or agreed to be received or accepted by a public official, "for or because of any official act performed or to be performed by such public official." *Id.* at 404 (discussing 18 U.S.C. § 201(c)(1)). In *Sun-Diamond*, the Government charged a trade association with making illegal gifts to the Secretary of Agriculture, Mike Espy, in violation of Section 201(c)(1). *Id.* at 400–01. Those gifts, with an estimated value of about $5,900, were given while there were two specific matters before the Secretary in which the trade association had an interest. *Id.* at 401–02. The Government did not prove a specific connection between the gifts and either matter, nor between the gifts and any other action of the Secretary. *Id.* at 402–03.

The Court reversed, holding that an illegal gratuity under the federal bribery statute requires proof of a connection between the gratuity and a specific official act performed or to be performed. *Id.* at 414. Therefore, the jury charge had been incorrect when it required a showing only that the trade

---

[3] A recent decision in the bribery context reaffirmed *Sun-Diamond*'s analysis. *See McDonnell v. United States*, 136 S. Ct. 2355, 2370 (2016).

association "gave Secretary Espy a gratuity because of his official position —
perhaps, for example, to build a reservoir of goodwill that might ultimately
affect one or more of a multitude of unspecified acts, now and in the future."
*Id.* at 405. The more natural reading of "for or because of any official act," the
Court held, required that "some particular official act be identified and
proved." *Id.* at 406.

An "official act" was "carefully defined," the *Sun-Diamond* Court said,
"to mean any decision or action on any question, matter, cause, suit, proceeding
or controversy, which may at any time be pending, or which may by law be
brought before any public official, in such official's official capacity, or in such
official's place of trust or profit." *Id.* at 406, 407 (quoting 18 U.S.C. § 201(a)(3)).
That definition required "that some particular official act be identified and
proved." *Id.* at 406.

The AKA does not provide any similarly detailed statutory definition to
guide our analysis. KBR argues that something akin to the bribery statute's
definition of "official act" should be read into the AKA's requirement of
"favorable treatment." The Government, though, argues that it makes more
sense to interpret the AKA's "improperly obtain or reward favorable
treatment" as a generalized requirement, arguing that is consistent with the
statute's text, purposes, and history. It contends the AKA was meant to deter
kickback activity among non-government officials regardless of whether the
subcontractor intended to obtain generalized or specific "favorable treatment."
The Government would have us limit the statute's reach through the word
"improperly." There is no statutory definition of that adverb, but the
Government offers that it means anything not "innocent" or "incidental." One
problem with that is it provides no reasonable notice to those in the
government-contracting arena as to when their acts are innocent and when
they are not. "When . . . no particular 'official act' need be identified, and the

giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the Government's discretion prevents [legal gift giving] from being prosecuted." *Id.* at 408.  We will not adopt such a non-standard.

The Government also relies on the 1986 amendments to the AKA.  At that time, Congress replaced prior language that the kickback needed to be offered "as an inducement for the award of a subcontract or order . . . or as an acknowledgement of a subcontract or order previously awarded" with new language that the kickback needed to be "for the purpose of improperly obtaining or rewarding favorable treatment . . . ."  *Compare* 41 U.S.C. § 51 (1980) (pre-amendment), *with* 41 U.S.C. § 52(2) (1986) (post-amendment).

Both parties find something in the Senate Report that accompanied the amendment to support their positions.  The Report stated that the earlier language required a specific act, while the new language was expressly meant to broaden the AKA's scope to "prohibit[] payments made to obtain or acknowledge any type of favorable treatment in the procurement process." *See* S. REP. NO. 99-435, at 11 (1986).  From KBR's viewpoint, the helpful Senate Report language is this:

> In order to exempt [*de minimis* gifts] from the bill, the Committee amended the definition of kickback to cover only those transactions made for the purpose of influencing procurement decisions.  This change generally excludes inexpensive items from the Act's coverage, since the exchange of [*de minimis*] gifts could not reasonably be expected to influence procurement decisions.

*Id.*  A legislative report not voted on by either house of Congress need not become the focus of judicial exegesis.  The statute itself controls.

Leaving the Report aside, we note that a common meaning of "favorable treatment," which is to give someone "a result that is in [his] favor," can include specific, identifiable treatment, but it can also be read to include generalized treatment.  *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 457, 1333 (11th ed. 2003).  Requiring no connection to identifiable treatment makes the

line between legal and illegal gift giving difficult to define.   We interpret any ambiguity in favor of KBR because Section 8702, which prohibits kickbacks and led to the civil penalties imposed here, also supports criminal penalties when the perpetrator "knowingly and willfully engages" in the conduct. *See* 41 U.S.C. § 8707. "Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).

We conclude that the 1986 statutory language of "favorable treatment," though more general than the prior requirement that the kickback be an inducement for a "subcontract or order," still requires a link between the kickback and some benefit being sought or already received.  A kickback that has the goal of obtaining or rewarding "favorable treatment" requires a pursuit of more than building better customer relations in the abstract.  The synonym for "treatment" we find most apt is that the kickback must be for "action," as opposed merely to developing more congenial feelings. *See* 18 OXFORD ENGLISH DICTIONARY 464 (2d ed. 1989) ("action or behav[ior] towards a person").

The Government argues, though, that *Sun-Diamond*'s limiting the reach of the statute only applies to illegal-gratuity cases under 18 U.S.C. § 201(c) and should not be extended to the AKA.  The Government cites a handful of appellate opinions, including one of our own, questioning or rejecting *Sun-Diamond*'s application outside the illegal-gratuity context. *See United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009); *United States v. Garrido*, 713 F.3d 985, 1000–01 (9th Cir. 2013); *United States v. Abbey*, 560 F.3d 513, 520–21 (6th Cir. 2009).  Our *Whitfield* decision and the cases it discussed dealt with bribery, which requires a quid pro quo.  In distinguishing *Sun-Diamond*, for example, a Second Circuit case cited in *Whitfield* refused to extend *Sun-Diamond*'s holding beyond the illegal-gratuity context "because the Supreme Court's chief concern in *Sun-Diamond* was 'supplying a limiting principle that

would distinguish an illegal gratuity from a legal one.'" *Whitfield*, 590 F.3d at 352 (quoting *United States v. Ganim*, 510 F.3d 134, 146 (2d Cir. 2007) (alteration omitted)). We explained that "no such limiting principle was required outside the gratuity context, because, unlike the gratuity statute, the extortion and bribery statutes require . . . 'the quid pro quo agreement.'" *Id.*

*Whitfield* and similar cases are inapplicable because the AKA contains no explicit quid-pro-quo requirement to distinguish legal gifts from illegal ones. It is also unlike the statute at issue in *Garrido* and *Abbey*, which required the gift be worth over $5,000. *See* 18 U.S.C. § 666. In each of those cases, the court thought it significant that the $5,000 "threshold monetary requirement" distinguished between "token gifts" and illegal gratuities. *See Garrido*, 713 F.3d at 1000; *see also Abbey*, 560 F.3d at 521.

A "kickback" is more similar to an illegal gratuity under Section 201(c) than it is to the gifts prohibited by Section 666. The Government's proposed reading would make it difficult for persons subject to the AKA to determine the point at which their conduct becomes illegal. Like the Government's rejected argument in *Sun-Diamond*, its interpretation here would make the terms of the AKA "snares for the unwary." *See Sun-Diamond*, 526 U.S. at 411.

We do, though, agree with the Government that "improperly" does some work. The word helps tie the gratuity to the "favorable treatment." The most natural meaning is that the "favorable treatment" must be obtained or rewarded in a way that is "improper," or "not in accord with . . . right procedure." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 626 (11th ed. 2003). The boundary may not be perfectly clear, but general guideposts do exist. Generally, there has been no kickback when a private party seeks to build a reservoir of goodwill with the hope or intent of obtaining more business. Among other variables, the size and timing of the gifts and the nature of the favorable treatment will impact whether something improper is occurring.

No. 15-41623

The Senate Report sought to identify examples of improper and proper conduct.[4]  As a general understanding, we conclude that anything of value offered in order to subvert the "proper" process for awarding contracts is a potential kickback.  The Senate Report's examples are consistent with that understanding.  Is the thing of value intended to cause the person in authority to forgive deficiencies in performance, overlook shortcomings in a bid or suggested contract, or obtain some other treatment not generally available?  Is the gift of such substantial value — monetarily or in some other way — as to gain an advantage beyond general goodwill?  These are all examples of the pursuit of improper favorable treatment.

We now turn to how the district court dealt with the issue.  It found that two KBR employees, Robert and James Bennett, accepted kickbacks from two EGL employees, Smoot and Kessner.  We have already held that James Bennett's knowledge is not attributable to KBR under Section 8706(a)(2).  Therefore, any gifts to him are not at issue.  We thus review only the gratuities from Smoot and Kessner to Robert Bennett.

---

[4] The Senate Report lists examples of "favorable treatment," none of which are simply generalized treatment:

Examples of "favorable treatment" covered by S. 2250 include, but are not limited to, receiving *improper* advance notice of a request for bids on a subcontract; obtaining certification as an eligible bidder *without meeting the proper standards* or when the bidders list has been *improperly* restricted; obtaining *normally unavailable* information about a competitor's bid or a project that is the subject of the subcontract; receiving *unusual* assistance in writing a bid; being allowed to submit a bid after a deadline has passed; receiving *improper* sole source consideration; *improperly* obtaining an award; obtaining *unwarranted* contract modifications; obtaining acceptance of substandard goods; being permitted to charge inflated prices or to recover *improper* expenses; and, in the case of independent sales representatives, receiving *improper* referrals of persons interested in bidding on subcontracts.

S. REP. NO. 99-435, at 11 (1986) (emphasis added).

18

Smoot testified that Robert Bennett was "the highest-ranking guy that we dealt with, and we wanted to develop a relationship" with him to gain "[m]ore business."  Smoot further testified that he believed Robert Bennett could help future business by "speak[ing] favorabl[y] of [the] company" and because "he would have a vote on . . . awarding additional contracts when contracts came available."  Such general efforts to develop goodwill and to earn future business through good working relationships, however, are insufficient if believed to support AKA liability by themselves.  The district court findings go further, though.  When asked why he provided gratuities, Smoot answered that it was because Robert Bennett "would bring service issues to us. Specifically he knew me based on entertaining; so, if they had issues, he would bring them to me before they escalated out of control."  To Smoot, Robert Bennett was "the most important [person at KBR] with regard to controlling service issues."

These factual findings are not clearly erroneous in light of the record evidence.[5]  It is true that the district court did not make any findings as to particular service problems Smoot intended to influence in an improper manner through his gratuities.[6]  Yet it is enough to connect the gratuity with the specific kind of treatment sought in a way that establishes impropriety. Because of the nature of the treatment Smoot sought, we find sufficient specificity about the treatment to support a finding of a kickback. The district court found Smoot gave gratuities to overlook performance problems,

[5] There is some conflicting evidence in the record.  Smoot and Kessner testified, for example, that they were not "trying to get [KBR] to accept substandard service" or "overlook performance deficiencies."  Such self-serving denials do not prevent contrary findings to be made based on the overall record.

[6] The record suggests such instances did exist, but the district court made no findings. For example, Smoot recalled two particular service problems, which had presumably been resolved by Robert Bennett without escalation.

something that would have otherwise been discordant with the proper process. Such findings support concluding that Smoot gave gratuities to Robert Bennett "to improperly obtain or reward favorable treatment."

The district court made similar findings as to the gratuities from Kessner to Robert Bennett. It found that Kessner, like Smoot, thought Robert Bennett was "a decision maker" and had a managerial role in KBR. It also found the object of Kessner's and Smoot's kickbacks was "to overlook performance issues on the EGL subcontract or to award future subcontracts or business to EGL." Even though Kessner's belief that entertaining Robert Bennett could help them gain further business is not by itself improper, Kessner's giving him gratuities to overlook performance deficiencies is improper. We find nothing clearly erroneous in these findings.

## III.    Relation-Back Under the False Claims Act

We have upheld the judgment that KBR improperly provided kickbacks to Robert Bennett. KBR argues we still must set that aside because of the statute of limitations. Generally, the AKA requires a civil action be brought within six years after the "Government first knew or should reasonably have known that the prohibited conduct had occurred." 41 U.S.C. § 8706(b)(2). It is undisputed that the Government should reasonably have known that prohibited conduct had occurred as of January 2004, when the relators filed their *qui tam* complaint. The Government intervened and filed its complaint in August 2010, over six years later.

The Government contends, and the district court held, that the AKA claims are timely under 31 U.S.C. § 3731(c), the subsection of the FCA providing for relation back. Section 3731(c) provides:

> If the Government elects to intervene and proceed with an action brought under [Section] 3730(b), the Government may file its own

No. 15-41623

complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief.  For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

31 U.S.C. § 3731(c).  KBR argues that Section 3731(c) permits relation back only for FCA claims, and thus it does not permit the Government's AKA action.

Both parties rely on Section 3731(c)'s plain language.  KBR argues that Section 3731(c)'s first use of "claims" must refer to "FCA claims" because the only "claims" in which the Government can intervene to "clarify or add detail to" are claims in "an action brought under [Section] 3730(b)."  We agree.  KBR then argues that because courts presume words in a statute are used consistently, "claims" must mean "FCA claims" throughout Section 3731(c).  *See Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1708 (2012).  As a result, only more FCA claims can be added, not AKA or other claims.  *See* 31 U.S.C. § 3731(c).

"A word or phrase is presumed to bear the same meaning throughout a text . . . ."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 170 (2012).  Canons of construction are guides, and they must be applied pragmatically; and compared to some others, this one "is particularly defeasible by context."  *Id.* at 171.  Here, context convinces us that, in Section 3731(c), Congress used the term "claims" generally and consistently, modifying it in different ways by placing it in different contexts.  The first time Section 3731(c) uses "claims" it means "FCA claims" because the surrounding words provide it that meaning.  The Government may "clarify or add detail to the claims" in which the Government is intervening, which are, because of the surrounding language,

21

necessarily claims in "an action brought under [Section] 3730(b)." To read it otherwise would not make sense.

The second time "claims" is used, though, its context is different — "to add any additional claims with respect to which the Government contends it is entitled to relief." This context does not limit the term. Rather, this part of Section 3731(c) permits the Government "to add *any additional* claims." That phrase suggests a broad meaning. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately *of whatever kind*.'" *United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (emphasis added) (citation omitted). In the context of Section 3731(c), therefore, "claims" need not be FCA claims. The term *is* used consistently throughout Section 3731(c), but not in the narrow sense KBR argues.[7]

This is not to say that the Government may take advantage of Section 3731(c)'s relation-back provision by adding any claims (FCA or not) to any *qui tam* FCA complaint. Indeed, the second sentence of Section 3731(c) provides the key limitation: "any such Government pleading shall relate back" to the original filing date "to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of th[e] person." 31 U.S.C. § 3731(c). Thus, as with Federal Rule of Civil Procedure 15, a new claim or pleading will not relate back when it "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *See Mayle v. Felix*, 545 U.S. 644, 650 (2005). Rather, to relate back, a new claim must be "tied to a common core of operative facts . . . ." *Cf. id.* at 664.

---

[7] In addition to being textually strained, KBR's reading would undermine judicial efficiency. Under it, the Government would often be required to engage in multiple lawsuits to litigate related FCA and AKA claims, even if such claims arose from the same underlying conduct, occurrences, or transactions. We conclude that Section 3731's text militates against such a reading.

We conclude that this reading creates no internal inconsistency even though Section 3731(d) uses "cause of action" rather than "claim." Subsection (d) reads: "In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." To KBR, the contrasting language suggests that "cause of action" should be read to mean "legal theory of a lawsuit" whereas "claims" should be read to refer to factual allegations *under the FCA*. Although we agree the terms have distinct meanings, we see no reason to constrict "claim" in that manner. That term generally refers to "[t]he aggregate of operative facts giving rise to a right enforceable by a court." BLACK'S LAW DICTIONARY 264 (8th ed. 2004); *cf.* FED. R. CIV. P. 8(a). "Cause of action," on the other hand, can refer to a legal theory. BLACK'S LAW DICTIONARY 235 (8th ed. 2004). Each term can retain its distinct, natural meaning and still coexist within Section 3731 without adopting KBR's narrow construction. For instance, it would be strange for Section 3731(d) to say that the United States "shall be required to prove all essential elements of the [claim]," referring to the facts giving rise to a right. A distinct term, "cause of action," was used to convey a distinct meaning. Likewise, it was not necessary to use "cause of action" instead of "claims" in Section 3731(c); the natural meaning of "claims" includes non-FCA claims. Under our reading of "claims," the language is internally consistent.

Finally, KBR argues the Government's AKA claims do not relate back because it did not continue to pursue its FCA claims after they were dismissed in April 2012. Section 3731(c) becomes operative only "[i]f the Government elects to intervene and proceed with an action brought under [Section] 3730(b) . . . ." 31 U.S.C. § 3731(c). KBR argues the Government "unquestionably declined" to "proceed" with an FCA action because it abandoned its FCA claims before this appeal. The argument has some

purchase, but not enough.  The Government did proceed with the FCA claims when it intervened and filed its complaint in August 2010.  When it did so, the rest of Section 3731(c) became operative, and the Government's AKA claims related back to August 2004.  *See id.*  The later dismissal of the Government's FCA claims did not change that.  "The viability of a cause of action in an original complaint does not necessarily affect the application of the relation-back doctrine."  *Cf. Watkins v. Lujan*, 922 F.2d 261, 264 (5th Cir. 1991) (discussing relation back in the Rule 15 context).

Even so, KBR argues the district court erred by accepting as timely nine alleged kickbacks occurring between January and June 2004.  Such gratuities, it argues, occurred after the relators' original complaint yet more than six years before the Government intervened in August 2010 and thus neither relate back nor are timely.  The district court agreed with KBR that the Government's complaint did not relate back to conduct occurring after the relators' January 2004 complaint.  Nonetheless, it held that KBR had failed to satisfy its burden of showing the Government knew or reasonably should have known the post-January 2004 AKA violations had occurred.

The district court correctly noted that KBR, as the party asserting the statute-of-limitations defense, bore the burden of proving limitations barred the Government's claims.  *See Frame v. City of Arlington*, 657 F.3d 215, 239 (5th Cir. 2011) (en banc).  It had to demonstrate the Government "first knew or should reasonably have known that the prohibited conduct had occurred" prior to August 2004, six years before the Government intervened and filed its complaint.  *See* 41 U.S.C. § 8706(b)(2); *cf. Gabelli v. SEC*, 133 S. Ct. 1216, 1224 (2013).  KBR did nothing to show the Government knew or should reasonably have known of the alleged kickbacks occurring between January and June of 2004, nor did the Government's "allegations affirmatively demonstrate that [its] claims [were] barred by the statute of limitations and fail to raise some

basis for tolling." *See Frame*, 657 F.3d at 240.  Whether the Government should have reasonably discovered the alleged kickbacks is a mixed question of law and fact that we review for clear error.[8] *See Colonial Penn Ins. v. Market Planners Ins. Agency Inc.*, 157 F.3d 1032, 1036 (5th Cir. 1998).  We cannot say the district court clearly erred in determining that KBR failed to establish the Government's post-January 2004 claims were time-barred.

\* \* \*

The district court did not clearly err by finding Robert Bennett's knowledge was imputable to KBR or by finding he accepted gratuities meant to improperly obtain or reward favorable treatment.  It thus did not err in holding KBR liable for kickbacks accepted by that Bennett.  Nor did it err in determining the Government's claims related back to the relators' *qui tam* complaint.  We AFFIRM those portions of its judgment.

The district court did clearly err by finding KBR liable for the gratuities accepted by James Bennett.  We REVERSE that portion of the district court's judgment.  We REMAND so that the district court may enter judgment consistent with this opinion.

---

[8] In its reply brief, KBR argues that "[b]y rejecting KBR's statute-of-limitations affirmative defense based solely on the parties' legal briefing, the district court effectively granted summary judgment against KBR," and so it urges us to review the issue under our summary-judgment standard.  We disagree and thus decline to do so.