# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 15, 2021

Lyle W. Cayce
Clerk

No. 20-50952
Summary Calendar

Bates Energy Oil & Gas, L.L.C.,

*Plaintiff*,

*versus*

Complete Oil Field Services, L.L.C.,

*Defendant—Counter Plaintiff—Appellee*,

*versus*

Unlimited Frac Sand, *doing business as* Frac Sand Unlimited; David Bravo,

*Counter Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:17-CV-808

Before King, Costa, and Ho, *Circuit Judges*.

Per Curiam:*

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-50952

David Bravo and his company Unlimited Frac Sand, doing business as Frac Sand Unlimited, appeal from a judgment of the district court finding them jointly and severally liable for $652,146.22 in damages (less any amount recovered from settlements with other parties) and $227,614.77 in attorneys' fees for their part in a conspiracy to defraud and steal money from Complete Oil Field Services, LLC. Because there was sufficient evidence for the trial court to conclude that Bravo and his company were part of the conspiracy, we AFFIRM.

## I.     FACTS & PROCEDURAL HISTORY

This case stems from a 2017 agreement whereby Bates Energy Oil & Gas, LLC ("Bates Energy") and its principal, Stanley Bates, agreed to procure frac sand[1] for Complete Oil Field Services, LLC ("COFS"). One of the key officials in Bates Energy was David Bravo, who was consistently listed and referred to as its Chief Operating Officer (COO). Bravo also later formed a new company, Unlimited Frac Sand, LLC d/b/a Frac Sand Unlimited ("FSU"), that was involved in these endeavors. FSU was managed by Bravo, had listed Bates's girlfriend as a manager, and had featured Bates as a Vice President/Member under the alias Phillip Stanley.

COFS and Bates Energy further agreed to place $1,000,000 of COFS's funds into an escrow account. A Proof of Funds letter for that account was sent to David Bravo as the COO of Bates Energy. Seeking to protect these funds, the money in the account could be withdrawn only with the mutual consent of both COFS and Bates Energy.

However, protection was not to be found. Unbeknownst to COFS, Dewayne Naumann, the principal of the escrow account, was a close

---

[1] "Frac sand" is used in the oil and gas industry and is essential for hydraulic fracturing, or fracking.

associate of Bates. Over a period of several months, between April and August 2017, Bates, Bravo, and Naumann coordinated the withdrawal of money out of the escrow account, without authorization, while maintaining the façade that Naumann was a neutral entity and that Bates and Bravo were diligently searching for frac sand to fulfill the contract. Ultimately, they misappropriated $652,146.22 of COFS's money and delivered no sand.

This fraud and theft occurred in two ways; Bravo played a key role in both. First, the group executed a series of unauthorized disbursements of COFS's money from the escrow account to Bates and his associates. This included David Bravo, who was listed as an intended recipient and received $47,500.00 through accounts held in his wife's name. Each of the disbursement authorizations stated: "electronic signature added under authorization by Frac Sand Unlimited, LLC." For one round of disbursements, the authorizations were signed by Bates but indicated in the "by" section that they were made by "David Bravo, CEO." Despite the clear terms of the escrow agreement, each of these disbursements was made without the knowledge or approval of COFS.

The group additionally defrauded COFS through a fraudulent purchase of sand from Tier 1 Sands ("Tier 1"). In connection with this transaction (and, again, without COFS's authorization or knowledge), Bates Energy and FSU arranged to pay Tier 1 the full price of the sand from the escrow account before the sand had been delivered. This is despite the fact that Bates Energy's agreement with COFS called for only half payment when the sand was loaded (as proven by a bill of lading) and then half payment upon receipt by COFS. One of the disbursement authorizations from the escrow account related to these transactions was signed by David Bravo, acting as CEO of FSU. Bravo also admitted during trial that he was aware that the funds for the purchase from Tier 1 came from the escrow account.

No. 20-50952

According to the purchase order, the sand from Tier 1 was slated to be delivered to David Bravo and FSU (not COFS) and listed Phillip Stanley (Bates's alias) as FSU's Vice President of Operations. Bates then provided COFS with bills of lading for part of the sand included in the purchase, leading COFS to authorize a distribution of funds for half of the purchase price for that portion (despite the fact that money had already been paid to Tier 1 from the escrow account for the shipments). This distribution for sand shipped by Tier 1 and supported by bills of lading was one of only two authorized distributions from the escrow account.[2] And even with proof that the sand had been bought, paid for, and shipped, COFS still did not receive any sand from Bates Energy. Bravo, FSU, and Bates, however, did receive sand—they simply declined to deliver it to its rightful purchaser, COFS. Instead, they kept the sand that had been purchased with COFS's money and later sold it on August 11, 2017, to a third party.

By July 2017, Bates Energy had yet to provide any frac sand to COFS per the contract; it would in fact never provide any sand throughout the course of its contractual relationship with COFS. However, as the district court noted, "though Bates and his associates were short on frac sand, they enjoyed a surplus of chutzpah." In a bold attempt at further obfuscation, Bates Energy sued COFS, alleging that COFS had refused delivery of frac sand and had "regularly sought withdrawals from the escrow account without the required authorization from Bates Energy."[3] Bates Energy funded its lawsuit against COFS with additional money disbursed from

---

[2] The other authorized distribution was made to another sand provider to cover for Bates Energy's failure to provide sand.

[3] David Bravo and FSU were not parties to that state-court lawsuit, which was solely filed by Bates Energy. Bravo and FSU were added in COFS's third amended counterclaim, after COFS had removed Bates Energy's initial complaint to federal court.

No. 20-50952

COFS's escrow account. Understandably perturbed to have been sued for breach of contract by the party who had failed to provide any frac sand per the contract, COFS terminated its agreement with Bates Energy on August 15, 2017, and demanded return of all funds from the escrow account. Still unaware of the unauthorized disbursements, COFS believed that amount to be $960,000. When all was said and done, the amount remaining in the escrow account and deposited in the court registry on order of the district court was just $347,853.78.

Shortly after receiving the notice of termination and the demand for the remaining funds from COFS, Bates e-mailed Bravo and Dewayne Naumann, the principal of the escrow account and ostensible neutral manager of the funds, "It's NOW or NEVER!" On August 23, 2017, Bates issued another distribution-of-funds request to the escrow account for demurrage charges to be paid to Bates Energy. These charges were not supported by any documentation and were supposedly in relation to demurrage for the shipment from Tier 1 that had been sold by Bravo and FSU to a third party on August 11, 2017.

After a two-day bench trial in March 2020, the district court found David Bravo and FSU liable for conspiracy to commit fraud and conspiracy to commit theft. The court therefore found them jointly and severally liable for damages amounting to $652,146.22. They were additionally found jointly and severally liable for $227,614.77 in attorneys' fees. Bravo and FSU filed a motion for a new trial which was denied. Bravo and FSU timely appeal.

## II.   STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Preston Expl. Co. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012) (quoting *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000)).

5

No. 20-50952

So long as the "district court's account of the evidence is plausible in light of the record viewed in its entirety," its findings must be affirmed, even if the court of appeals might "have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). A court of appeals may only overturn a district court's factual finding "when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 584 (5th Cir. 2014).

## III.   DISCUSSION

Bravo appeals the district court's judgment, arguing that he did not participate in a conspiracy. As this is a diversity action, we apply state law. *See Samuels v. Drs. Hosp., Inc.*, 588 F.2d 485, 488-89 (5th Cir. 1979). "In Texas, a civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996). "The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) (citations omitted).

One can be liable for conspiracy even if he himself did not commit the underlying bad acts; civil conspiracy "extend[s] liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979) (alteration in original) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 46, at 293 (1971)). "Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators

6

No. 20-50952

in furtherance of the unlawful combination.' " *Id.* at 926 (quoting *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937)). Additionally, direct evidence of a conspiracy (such as smoking-gun phone calls or e-mails) are not required; "proof of a conspiracy may be, and usually must be made by circumstantial evidence." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968).

In this case, the district court found a conspiracy to commit two unlawful acts: fraud and theft. Therefore, there must be sufficient evidence (1) that a fraud and theft occurred and caused COFS damage, and (2) that there was a meeting of the minds between Bravo, FSU, and other parties in furtherance of that fraud and theft. There is. We take each conspiracy claim in turn.

## A. Conspiracy to Commit Fraud

"To prevail on a fraud claim, a plaintiff must show: (1) the defendant 'made a material representation that was false'; (2) the defendant 'knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth[';] (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.,* 546 S.W.3d 648, 653 (Tex. 2018) (quoting *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

There is ample evidence both that Bates, Bates Energy, and other parties hatched a scheme to defraud COFS, and that Bravo was a co-conspirator in that scheme. From the beginning of its contractual relationship with COFS, Bates Energy misled COFS about its ability to procure and provide the amount of sand specified in the contract. It additionally made false statements to COFS about the nature of the escrow account.

Specifically, its assertions that money would only be withdrawn from the account with the authorization of both parties and to pay for sand shipments supported by a bill of lading and then actually delivered were false.

The conspirators' actions and words demonstrate an intent to misappropriate COFS's money without ever providing sand under the contract. Examples include the sale of the only sand ever procured (with COFS's money) to a third party who was not COFS, and the e-mail sent by Bates to the other co-conspirators stating "it's NOW or NEVER" after learning that their access to the escrow account was about to be blocked. Further proof comes from the fact that this e-mail was followed by another unauthorized disbursement, one made after the group had knowledge that COFS had demanded return of its money and terminated the agreement. COFS was justified to rely on these representations and to trust in the contracts it had signed, which stated that Bates Energy would procure sand and that COFS's money would be protected in an escrow account. This scheme was a fraud, plain and simple.

Additionally, there is ample evidence to support the judgment that Bravo and FSU were members of the conspiracy. Bravo was listed as the COO of Bates Energy, the company that defrauded COFS. Further, in a state-court proceeding, Bravo testified that COO "might have been one of the titles . . . relegated to" him and, in the same proceeding, Bravo was identified by Bates Energy's attorney as the company's COO. While Bravo may have testified at trial that he was not an employee of Bates Energy and did not consider himself its COO, the trial court was well within its rights to credit the substantial evidence to the contrary. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). In addition, Stanley Bates, Bates Energy's principal and the apparent leader of the conspiracy, was listed as a Vice President of FSU.

No. 20-50952

Bravo and FSU's names peppered the disbursement authorizations that were issued without COFS's consent. Bravo additionally received a substantial amount of money from these disbursements through an account held in his wife's name. Bravo and FSU themselves made the fraudulent purchase of sand from Tier 1 with COFS's money and then sold it to a third party rather than delivering it to COFS. All of this evidence directly contradicts Bravo's assertions that he did not have access to the escrow account. In any event, that contention is irrelevant since another member of the conspiracy, Naumann, *did* have access to the account, and abused that access by making unauthorized distributions of funds to others, including Bravo.

Bravo was also a recipient of Bates's panicked "NOW or NEVER" e-mail when it was clear that the well of funds was about to run dry; the trial court was within its rights not to be convinced by Bravo's assertions that he believed this e-mail to be referring to fulfillment of the contract that had been terminated earlier that day. We hold that there was sufficient evidence to find that Bravo was a member of the conspiracy to commit fraud. And because Bravo's knowledge is imputed to the company he ran, FSU, it is appropriate to hold FSU liable for conspiracy as well. *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 372 (5th Cir. 2017) ("A corporation cannot act or have a mental state by itself, and thus, under the common law, the acts and mental states of its agents and employees will be imputed to the corporation where such natural persons acted on behalf of the corporation." (quotations omitted)).

## B. Conspiracy to Commit Theft

A claim for theft derives from the Texas Theft Liability Act, which states that " '[t]heft' means unlawfully appropriating property . . . as described by" certain sections of the Texas Penal Code. Tex. Civ. Prac.

9

No. 20-50952

& REM. CODE § 134.002 (2021). The relevant portion of the Penal Code, Section 31.03, states that:

> (a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.
> (b) Appropriation of property is unlawful if:
>> (1) it is without the owner's effective consent; [or]
>> (2) the property is stolen and the actor appropriates the property knowing it was stolen by another[.]

TEX. PENAL CODE § 31.03(a), (b)(1)-(2) (2021).

The same evidence that supports the existence of a fraud, and a conspiracy to commit that fraud, supports the claim for theft and conspiracy to commit theft. By making unauthorized distributions from the escrow account, without COFS's consent as required by the terms of the escrow agreement, the conspiracy unlawfully appropriated COFS's money, and intended to do so. Those actions alone are sufficient to prove theft. And just as Bravo and FSU had more than sufficient connections to prove conspiracy liability for fraud, there is clear evidence to support a judgment of liability for conspiracy to commit theft. Bravo was aware after at least the second transaction that the money he was receiving came from the escrow account. Bravo also had his name listed on at least one of the disbursement authorizations, and FSU was listed on every authorization.

Throughout the entire course of their dealings with COFS, "Bates and his cadre . . . . lied, cheated, and stole." There was sufficient evidence to support the district court's judgment that Bravo and FSU were part of that cadre, and thus jointly and severally liable for conspiracy.

## IV.    CONCLUSION

For the foregoing reasons, we AFFIRM.