# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 21, 2023

Lyle W. Cayce
Clerk

No. 21-60568

CONSOLIDATED WITH

No. 22-60145

UNITED STATES OF AMERICA, *ex rel*, JAMES ALDRIDGE,

*Plaintiff—Appellee*,

UNITED STATES OF AMERICA,

*Intervenor—Appellee*,

*versus*

CORPORATE MANAGEMENT, INCORPORATED, *a Mississippi corporation* (CMI); STONE COUNTY HOSPITAL, INCORPORATED; H. TED CAIN, *professionally and in his individual capacity*; JULIE CAIN; THOMAS KULUZ,

*Defendants—Appellants*.

Appeals from the United States District Court
for the Southern District of Mississippi
USDC No. 1:16-CV-369

Before JONES, HO, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

This False Claims Act case involves Medicare reimbursements to Stone County Hospital (SCH), a critical access hospital in Wiggins,

No. 21-60568
c/w No. 22-60145

Mississippi.  This appeal follows a nine-week jury trial, which resulted in a $10,855,382 verdict (approximately $32,000,000 trebled) for the Government.  At trial, the Government proved that Appellants (a corporate management company, company owner, corporate executives, and SCH)[1] defrauded Medicare out of millions over the span of twelve years by overbilling for the owner's and his wife's compensation despite little or no reimbursable work.

Generally speaking, Appellants' arguments on appeal fail to undercut the jury's verdict.  But the Government's dilatory conduct over the protracted procedural history of this case gives pause, even if the Government largely prevails today:  The Government sought to extend the seal entered by the district court pursuant to 31 U.S.C. § 3730(b)(3) *eighteen* times and delayed its intervention in the relator's action for eight years, all while conducting one-sided discovery against Appellants.  When Appellants interposed the statute of limitations because of the Government's dawdling, the Government maintained its claims were timely.  It does the same on appeal.  But the Government's own sealed extension request memoranda, which remain sealed to this day, demonstrate otherwise.  As to the district court's final merits judgment, we therefore affirm in large part, reverse in part, and remand.

The district court's judgment in favor of the Government included an order barring Appellants from dissipating their assets.  Almost two years later, the district court issued a temporary enforcement order that specifically barred Appellants from selling a piece of real property.  Appellants separately appealed the enforcement of this post-judgment injunction. We

---

[1] The term "Appellants" is used in referring to the defendants collectively; however, defendant Starann Lamier is not part of the appeal.

No. 21-60568
c/w No. 22-60145

consolidated the appeals. Because we lack jurisdiction over the district court's enforcement injunction, we dismiss the latter appeal.

## I.

### A.    The FCA

The False Claims Act (FCA) is "the Government's primary litigative tool for combatting fraud" against the Government. S. Rep. No. 99-345, at 2 (1986). The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, or causes to be made, a false statement or record material to a false claim." 31 U.S.C. §§ 3729(a)(1)(A), (B). Violators of the FCA are liable for civil penalties "plus 3 times the amount of damages which the Government sustains because of" their conduct. *Id.* § 3729(a)(1).

FCA actions may be brought by the Attorney General or by a private party, known as a *qui tam* relator, in the name of the United States. 31 U.S.C. §§ 3730(a), (b)(1). The Government, if it so chooses, may intervene in a relator's action and "conduct[]" the litigation. *Id.* § 3730(b). If the Government prevails in the litigation, the relator shall be awarded no less than 15 percent but no more than 25 percent of the proceeds of the action or settlement. *Id.* § 3730(d). When a *qui tam* relator brings an action under the FCA, "[t]he complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." *Id.* § 3730(b)(2). "The Government may, for good cause shown, move the court for an extension of the time during which the complaint remains under seal . . . [and] [t]he defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed[.]" *Id.* § 3730(b)(3).

3

No. 21-60568
c/w No. 22-60145

### B.      *Critical Access Hospitals and Medicare Reimbursement*

"Critical access hospitals" serve rural populations who otherwise lack access to healthcare via other nearby hospitals. To incentivize this access to care, Medicare reimburses these hospitals at 101% of cost. 42 C.F.R. § 413.5 (reimbursement parameters); § 413.64 (reimbursement procedures); § 413.70 (critical access hospital reimbursement). According to the Government, the Centers for Medicare and Medicaid Services (CMS) typically continue to reimburse a critical access hospital's costs even when allegations of fraud surface, in order to ensure access to care for underserved Medicare beneficiaries. CMS later seeks recovery of the wrongful overpayments. This practice is commonly known as "pay and chase."

CMS delegates administration of Medicare's critical access hospital program to Medicare Administrative Contractors (MACs). MACs, also called "Fiscal Intermediaries," are contractors that handle provider reimbursement services. MACs assist providers in interpretation and application of Medicare reimbursement rules. 42 C.F.R. § 413.20(b). They also act as Medicare's oversight agents, auditing cost reports, setting payment amounts, and identifying potential overpayments or fraudulent claims. Aside from the FCA, which is used to combat fraud, CMS also has an administrative process employed by MACs for recovering payments. *See* CMS Provider Reimbursement Manual (PRM) Chapter 24, available at https://www.cms.gov/Regulations and Guidance/Guidance/Manuals/Pap er-Based-Manuals-Items/CMS021929.[2]

---

[2] The PRM provides that "[t]here are generally two ways in which repayment can be made: (l) refund and (2) set-off, or a combination of these two." PRM § 2409. If a MAC finds that a provider furnished "excessive services which were neither reasonable nor medically necessary . . . and has been billing for such services," the MAC investigates the claims and seeks repayment from the provider. PRM § 2409.2. Once the overpayment amount is determined, the MAC arranges for repayment and may allow an extended set-

No. 21-60568
c/w No. 22-60145

Medicare sets reimbursement payments to critical access hospitals using "cost reports," which are statements detailing hospital operating costs for the prior year. 42 C.F.R. § 413.20 (cost reporting principles). Medicare regulations govern reimbursement of owner compensation. 42 C.F.R. § 413.9 (defining what constitutes a reasonable, necessary, and proper cost). Medicare does not use a formula to set hospital owner and administrator compensation. Rather, compensation is subject to a "test of reasonableness" guided by the PRM.

The PRM provides that "[a] reasonable allowance of compensation for services of owners is an allowable cost, provided the services are actually performed in a necessary function." "Necessary" means that "had the owner not furnished the services, the institution would have had to employ another person to perform those services." Such services must be related to patient care and be documented. *See* 42 C.F.R. § 413.20 (governing necessary documentation for cost reimbursement). Owner compensation must be limited to what is paid for comparable services by comparable institutions and is controlled by the fair market value of the services provided on the open market. The PRM disallows costs related to "managing or improving the owner's financial investments." These compensation rules also apply to an owner's relative.

C.    *Appellants and Medicare Submissions at Issue*

SCH is a 25-bed hospital in Wiggins, Mississippi, with a daily census of less than 12 patients. Ted Cain, the sole owner of SCH, acquired the hospital in 2001 and enrolled it as a critical access hospital with CMS. Ted

---

off period to avoid "financial hardship." *Id*. If the provider objects to the MAC's decision, it may pursue an administrative appeal followed by judicial review. *See* 42 C.F.R. §§ 405.1801 *et seq*. (appeal procedures); PRM Chapter 29 (appeal guidance).

No. 21-60568
c/w No. 22-60145

owned or operated multiple nursing homes over his career. Ted's wife Julie Cain served as SCH's hospital administrator from 2003 to 2012. Julie also held a nursing home administrator's license and a social worker's license.

Corporate Management, Inc. (CMI) served as a management company for SCH and Ted's other businesses. Ted is the owner and chief executive officer of CMI. CMI served as SCH's "home office," providing centralized administrative services, management support, and consulting services for SCH and the other businesses under its management. Tommy Kuluz served as CMI's chief financial officer, and Starann Lamier served as chief operations officer.

Two types of Medicare submissions are at issue in this case: SCH's cost reports and CMI's home office cost reports. CMI annually submitted both types of cost reports on behalf of SCH and itself. Kuluz gathered the information for the cost reports but relied on an outside accounting firm to prepare them. Ted reviewed the cost reports after their preparation.

SCH's cost reports indicated the hospital was a critical access hospital and catalogued hospital-specific costs such as doctors' salaries and supply costs. The reports identified the amounts SCH paid to CMI as a management company but did not separately identify the compensation paid to Ted. CMI's cost reports enumerated its expenses as the management company for numerous entities that Ted owned or controlled. CMI, through Kuluz, allocated Ted's compensation across these entities and, from 2004 to 2009, directly allocated much of Ted's salary to SCH (via the CMI home office report). From 2010 to 2015, CMI included Ted's salary in a "pooled allocation" of home office costs, meaning that his salary was allocated across all businesses in proportion to their revenues.

6

No. 21-60568
c/w No. 22-60145

### D.    *Procedural History*

Relator James Aldridge worked at CMI and served as SCH's CEO from 2005 to 2006. He filed this action under seal in May 2007, alleging the Cains and others had submitted false claims to Medicare.[3] His *qui tam* complaint alleged that Appellants violated the FCA by inflating supply costs, "ping-ponging" patients between nursing homes and SCH to manipulate the facilities' "swing bed" status, and improperly waiving copays and deductibles. Aldridge filed an amended complaint in November 2009, reasserting these allegations.

On August 13, 2007, the United States filed its first motion for an extension of time, and of the initial seal period, to consider its election to intervene. All told, the Government went on to file eighteen sealed motions for extensions of time, the last on June 1, 2015.

On January 20, 2010, the Government moved for a partial lifting of the seal to disclose Aldridge's operative complaint to Appellants, and the district court granted the motion. On March 9, 2010, the Government first notified Appellants that it was investigating sealed *qui tam* allegations against them and requested that they provide information to aid its investigation. Initially cooperating, Appellants voluntarily produced thousands of documents and provided numerous employees for interviews. In October 2011, after Appellants informed the Government they would cease their

---

[3] On May 31, 2007, the district court granted Aldridge leave to file his first complaint under seal, per 31 U.S.C. § 3730(b)(2). All documents filed in the case were to remain under seal until further order of the district court. The case thus proceeded without Appellants' involvement or knowledge until the Government requested a partial lifting of the seal almost three years later, to disclose Aldridge's complaint to them and request their cooperation in the investigation. Other portions of the case were unsealed over the Government's eight-year investigation, but several documents remain under seal, including the Government's series of seal extension memoranda, as discussed *infra*.

No. 21-60568
c/w No. 22-60145

voluntary compliance, the Government issued Civil Investigative Demands (CIDs) for more materials and information. After objections and motions practice, the district court enforced the CIDs, held Appellants in contempt, and ordered the Cains, Kuluz, and Lamier to give depositions to Government investigators.

Eight years after its initial extension motion, on September 18, 2015, the Government intervened in Aldridge's action. Its intervenor complaint included a common law claim for unjust enrichment. The Government thereafter filed an amended complaint in December 2015, adding a common law claim for payment by mistake of fact. The Government's amended complaint alleged that Ted and Julie Cain and Kuluz took advantage of Medicare's 101% reimbursement rate to SCH to defraud Medicare out of millions of dollars from 2002 to 2013. The fraud was accomplished through a sweetheart contract between SCH and Ted's management company, CMI, which charged SCH almost twice as much as CMI charged for the same services to other entities that were not critical access hospitals (and thus could not bill Medicare at 101% cost). These "management fees" also provided an opportunity to disguise the actual amount paid as compensation to Ted, which was fifteen times the average compensation for like services. The fees were billed through SCH's Medicare cost report and were not detectable from the face of the report. Moreover, Ted received these inflated amounts even though he did little to no work at SCH. Appellants likewise billed Medicare hundreds of thousands of dollars for work supposedly (but not actually) performed by Julie, first as a hospital administrator and then as a consultant and director.[4]

---

[4] The Government calculated that, from 2004 to 2015, the MAC reimbursed Ted a total of $11,779,551 in compensation. During that same period, the MAC reimbursed Julie $1,598,970.

No. 21-60568
c/w No. 22-60145

Following the Government's intervention, Appellants moved to dismiss its claims, arguing that the Government's eight-year delay violated the FCA and prejudiced them. Appellants also moved to unseal the entire record, including the Government's extension request memoranda. After a hearing with all parties and an ex parte conference with the Government, the district court denied the motion to dismiss and unsealed only the Government's pro forma extension motions and the court's orders granting them; it refused to unseal the eighteen extension memoranda. Those memoranda remain sealed.

Beginning January 13, 2020, the district court held a nine-week jury trial. There were 25 witnesses who testified and numerous evidentiary exhibits. Ultimately, the jury found the Cains, Kuluz, SCH, and CMI jointly and severally liable for approximately $10 million. On May 10, 2020, thirteen years after the case began, the district court entered judgment, trebling the damage award to over $32,000,000.

The parties filed several post-trial motions. Appellants renewed their motion to unseal the Government's extension request memoranda. Appellants then moved for post-trial discovery to probe the relator's post-trial disclosures. Last, Appellants moved for a judgment as a matter of law and a new trial. In February 2021, the district court held argument on the pending motions, and in June 2021, the court issued its ruling confirming the judgment.

Appellants timely appealed. They challenge the sufficiency of the evidence proving the FCA claims; the district court's application of the FCA's statute of limitations; the court's grant of eighteen seal extensions, which allowed the Government unilaterally to "investigate" Appellants for eight years; and several evidentiary and post-trial discovery rulings.

9

No. 21-60568
c/w No. 22-60145

## II.

We review the denial of a motion for judgment as a matter of law "*de novo*, using the same analysis as the district court." *United States v. Hodge*, 933 F.3d 468, 473 (5th Cir. 2019). We reverse the district court's ruling only if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the nonmovant.]" *Id.* (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)). We review a district court's denial of a motion for a new trial for abuse of discretion. *Fornesa v. Fifth Third Mortg. Co.*, 897 F.3d 624, 627 (5th Cir. 2018). We reverse "only when there is an absolute absence of evidence to support the jury's verdict." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022) (internal quotation marks and citation omitted). In both instances, our review of the jury's verdict is "especially deferential." *Id.*

We review a district court's evidentiary rulings for abuse of discretion. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 370 (5th Cir. 2000). "[T]o vacate a judgment based on an error in an evidentiary ruling, this court must find that the substantial rights of the parties were affected." *Id.* (internal quotation marks and citation omitted). We also review a district court's decision to deny discovery for abuse of discretion. *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011).

## III.

The FCA "imposes significant penalties on those who defraud the Government." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016). That said, the FCA "is not an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194 (internal quotation marks and citation omitted). "In determining whether liability attaches under the FCA, this court asks (1) whether there was a false statement or fraudulent course of

10

conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 653–54 (5th Cir. 2017) (internal quotation marks and citation omitted).

In their first two issues on appeal, Appellants contend that "[t]he Government did not—and cannot—meet its burden on two elements: materiality and scienter." In the alternative, Appellants contend that "[a]t minimum, the FCA judgment against Julie Cain must be reversed because she did not knowingly assist in the presentation of a false claim."

### A.    *Materiality*

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the FCA." *Escobar*, 579 U.S. at 192. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Although the materiality standard is "demanding," *Escobar*, 579 U.S. at 194, "[n]o one factor is dispositive, and our inquiry is holistic," *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019). A non-exhaustive list of the factors we consider includes: (a) whether the alleged violations are conditions of payments; (b) whether the Government would deny reimbursement if it knew of the violations; and (c) whether the noncompliance is substantial or minor. *Id.* at 161–63. As these factors indicate, a misrepresentation is material when it goes "to the very essence of the bargain." *Escobar*, 579 U.S. at 193 n.5 (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393 (1931)).

Appellants assert the Government's "pay and chase" recoupment method, whereby Medicare pays claims upon submission and then pursues

No. 21-60568
c/w No. 22-60145

violations after the fact, defeats the FCA's materiality requirement. According to Appellants, the fact that Medicare continued to reimburse SCH even as the Department of Justice (DOJ) conducted an eight-year investigation into allegations of fraud belies any contention that Appellants' cost-report certifications influenced the Government's decision to pay. As support for this position, Appellants refer the court to *Escobar*. There, the Supreme Court noted that the Government's regular payment of a claim in full despite actual knowledge that certain requirements were violated "is strong evidence that the requirements [were] not material." *Id.* at 195.

The Government counters that Appellants' position is too narrow under this court's holistic approach to determining materiality. The Government cites *United States ex rel. Longhi v. United States*, 575 F.3d 458, 468–69 (5th Cir. 2009), where this court rejected the "outcome materiality standard," which would require a misrepresentation to affect the Government's ultimate decision to remit funds in order to be material. Regarding its decision to employ the "pay and chase" policy, specifically, the Government contends that various circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality—for example, public health and safety. The Government asserts that such is the case here where it was important for potential patients of SCH to continue to have access to healthcare. For these reasons, the Government maintains, its "pay and chase" approach does not neutralize the evidence supporting the jury's finding of materiality. We agree.

Viewing the evidence presented to the jury *in toto* and giving the jury's verdict requisite deference, the record contains sufficient evidence to

No. 21-60568
c/w No. 22-60145

support a finding of materiality.[5]  This is so regardless of the Government's pay and chase policy, which we decline to second-guess in this case.  For example, when enrolling SCH as a critical access hospital, Ted certified that he was familiar with Medicare regulations and understood that payments were conditioned on compliance with them.  Moreover, Appellants' fraud was substantial, amounting to approximately $10 million over 12 years.  And finally, the Appellants' fraud went to the essence of the bargain.  The cost reports and statements that Appellants submitted to Medicare were the basis for determining reimbursement amounts owed to SCH and CMI.

While *Escobar* articulated that continued payment despite knowledge of fraud often indicates lack of materiality, "often" does not mean "always." Here, Appellants' reliance on *Escobar* is misplaced.  For starters, it is not clear that CMS and the MAC were cognizant of Appellants' fraud.[6]  More to

---

[5] The jury received lengthy instruction on the term "materiality." In part, the district court explained:

> For purposes of the False Claims Act, the term "materiality" means having a natural tendency to influence or being capable of influencing the payment or receipt of money.  A matter is material if, one, a reasonable person would attach importance to it in determining a choice of action in a transaction, or two, that one or more defendants knew or had reason to know that the recipient of the representation would attach importance to the specific matter in determining the choice of action, regardless of whether a reasonable person would do so.  Materiality means a holistic analysis without any single factor being dispositive.  Minor or insubstantial noncompliance is not material.

[6] Appellants rely heavily on *United States ex rel. Janssen v. Lawrence Memorial Hospital*, 949 F.3d 533 (10th Cir.), *cert. denied*, 141 S. Ct. 376 (2020), to counter the district court's "suggest[ion] that 'the *Escobar* Court starts from a point of actual knowledge on the part of the Government, not suspicion nor mere allegations[.]'" But *Janssen* stemmed from a district court's grant of summary judgment, not a jury verdict.  Moreover, the *Janssen* court likewise acknowledged that the materiality requirement is holistic, and "[n]one of [the *Escobar* factors] alone are dispositive." *Id*. at 541.  To that end, other factors

13

the crux, the evidence presented to the jury showed that without continued reimbursements, SCH, a critical access hospital that relied on Medicare for over 70 percent of its revenue, would have probably closed. Stopping reimbursements upon the first allegations of fraud would thus have undermined CMS's goal of sustaining healthcare access for underserved rural patients. "The byzantine laws governing Medicare reimbursement have been aptly described as a 'labyrinth' . . . [but] [e]ven the most complicated labyrinth has an outer boundary[.]" *United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020) (quoting *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 349 (D.C. Cir. 1987)). Appellants crossed this boundary and may not now interpose Medicare's reimbursements during their fraudulent activities to argue that all was copacetic. We decline to disturb the jury's finding of materiality.

### B.    Scienter

Appellants next assert that the Government did not carry its burden regarding scienter, which requires proof that Appellants "knowingly" made false or fraudulent claims. Appellants argue that: (1) the FCA requires objective falsity, and the Government did not prove that Appellants made objectively false statements about their salaries; and (2) because this case centers around a disputed interpretation of an ambiguous regulation, Appellants could not have acted "knowingly" to defraud by basing their actions on a reasonable interpretation, particularly when they were not warned away from that interpretation.

The Government responds that there was ample evidence for the jury to find that Appellants acted knowingly under the FCA. This evidence

---

in *Janssen* supported a finding of immateriality. *See id.* at 543. And while *Janssen* involved reimbursements to a hospital, it does not appear to have been a critical access hospital.

included testimony that Ted and Julie Cain performed little, if any, reimbursable work at SCH or CMI for their grossly inflated salaries. And that testimony was accentuated by Appellants' paucity of evidence showing any substantial, reimbursable work. The Government highlights that Appellants certified that they knew and would follow Medicare's rules, including Medicare's documentation requirements. The Government adds that the FCA does not require "objective falsity," and, even if it did, Appellants forfeited any argument regarding objective falsity by raising it for the first time on appeal. Finally, the Government contends that Medicare provides clear standards for providers to determine reasonable owner compensation, such that the regulations at issue were not ambiguous and did not require "warning away" Appellants from their excessive billings.

First, objective falsity.[7] Appellants cite *Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370 (5th Cir. 2004), to support their contention that the FCA requires proof of objective falsity. In *Riley*, we noted that "[t]he *district court* concluded . . . that expressions of opinion or scientific judgments about which reasonable minds may differ cannot be 'false.'" *Id*. at 376 (emphasis added). And we "agree[d] in principle with the district court and accept[ed] that *the FCA requires a statement known to be false, which means a lie is actionable but not an error*." *Id*. (emphasis added). But contrary to Appellants' position, *Riley* did not establish an objective falsity standard, and we decline in today's

---

[7] We disagree that Appellants forfeited their objective falsity argument. Though Appellants did not use the term "objective falsity" in their post-trial motions, they argued that the Government could not prove they made a "knowingly false claim" because, pursuant to Medicare's provider reimbursement manual, an owner's compensation is governed under a test of reasonableness. On appeal, Appellants' objective falsity argument is premised on the corresponding contention that reasonableness is a matter of opinion, and thus cannot be objectively false.

case to address whether the FCA requires it.[8]  There was sufficient evidence to support the jury's finding of scienter regardless.

"What matters for an FCA case is whether the defendant knew the claim was false." *United States ex rel. Shutte v. Supervalu Inc.*, 143 S. Ct. 1391, 1396 (2023); *see also Riley*, 355 F.3d at 376 ("[T]he FCA requires a statement known to be false[.]").  And there was ample testimony at trial that the Cains performed little, if any, reimbursable work at SCH, yet they knowingly sought reimbursement for inflated compensation.[9]  Several employees testified that they never saw Ted do any work at the hospital and that they never communicated with him about anything related to the hospital or its patients.  The employees further testified that when they did see Ted, it was "[u]sually in the cafeteria" on "Wednesdays for fried chicken and Fridays for catfish."  Along this same line, testimony highlighted that Appellants produced a total of six hospital documents from the years 2004 to 2015 that Ted had signed (not including documents merely stamped with his signature) and virtually no documentation that would allow an audit of Ted's work (despite such being a prerequisite under the PRM).  There was similar testimony that Julie was rarely at the hospital, and when she was, she was not doing work related to patient care.

Second, Appellants' "reasonable interpretation" of the regulations. Here again, assuming *arguendo* ambiguity in the reimbursement regulations,

---

[8] As Appellants acknowledge, there is currently a circuit split on whether the FCA requires objective falsity—and *Riley* has been cited in support of both sides.  *Compare United States v. Care Alternatives*, 952 F.3d 89, 95–100 (3d Cir. 2020) (rejecting objective falsity standard), *with United States v. AsercaCare, Inc.*, 938 F.3d 1278, 1296–1301 (11th Cir. 2019) (adopting objective falsity standard).

[9] Appellants' argument that the jurors clearly believed Ted performed *some* work is only speculation.  The verdict does not provide any explanation from the jury, and we cannot divine what work the jury credited to Ted.

we agree with the Government that Appellants' interpretation of them was not reasonable. The Government presented expert testimony that despite the Cains' lack of compensable work, they submitted grossly unreasonable compensation claims to Medicare. The Government showed that Ted received compensation ten to sixteen times the national average for critical access hospital executives.[10] Moreover, Kuluz testified there were no time studies and no supporting documents for Ted's compensation; rather, he "estimated" Ted's hours for the Medicare cost report. Similarly, the Government presented evidence that Julie's salary, as the prior hospital administrator, was at times double that of the incumbent administrator. Based on this evidence, we uphold the jury's finding that Appellants "knowingly" made false or fraudulent claims.[11]

### C.    Julie Cain

Appellants next contend that, at a minimum, the jury's FCA verdict against Julie Cain should be reversed. According to Appellants, Julie did not certify cost reports or make statements to Medicare, and "at most [the Government] proved that Julie should have suspected others of submitting

---

[10] The Government's exhibits showed that, based on a 2009 IRS report, the national average executive compensation for critical access hospitals was $177,600. But Ted billed Medicare $907,649 for his salary in 2004 and $2,796,045 in 2009. Ted lowered his claimed compensation after the Government notified Appellants of its investigation in 2010, but he still billed Medicare for compensation five times the national average.

[11] Appellants also challenge the jury's verdict on the Government's common law claims—asserting that those claims circumvent the administrative process and because the claims lack merit. The district court declined to enter judgment on those claims, concluding they were subsumed in the verdict as to the FCA claims. Because we affirm the FCA judgment, Appellants' challenge is moot. *See Drummond*, 950 F.3d at 284. Moreover, Appellants failed to raise their attack on the common law claims in their motion for judgment as a matter of law or their motion for a new trial. "A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal[.]" *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

false claims and acted to prevent them doing so." Appellants characterize this behavior as "passive acquiescence, not knowing assistance."

The Government responds that Julie played a critical role in setting the fraud in motion, executing "a management agreement on behalf of SCH that allowed CMI to charge SCH up to 15% of revenue despite that CMI charged all the other Cain entities half that." The Government also notes that Julie knew that the costs attributed to SCH had to be reasonable, necessary, and related to patient care, but nonetheless deliberately disregarded the excessive compensation being funneled through the CMI management agreement, including her own.

The record provides sufficient evidence to support the jury's verdict against Julie. "The FCA applies to anyone who knowingly assists in causing the Government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the Government." *Riley*, 355 F.3d at 378 (cleaned up). "Knowing assistance" does not require that a person "be the one who actually submitted the claim forms in order to be liable." *Id.* (internal quotation marks and citation omitted).

To the contrary, as district courts have discussed, "[t]he causation standard employs traditional notions of proximate causation to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim." *U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015) (internal quotation marks and citation omitted); *see also United States v. Hodge*, 933 F.3d 468, 474–75 (5th Cir. 2019) (applying proximate causation in FCA housing case). Such nexus "merely demands more than mere passive acquiescence in the presentation of the claim and some sort of affirmative act that causes or assists the presentation of a false claim." *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 655 (N.D. Tex. 2020) (internal quotation marks

No. 21-60568
c/w No. 22-60145

and citation omitted).  "[M]ere negligence" is not actionable.  *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 513 F. Supp. 2d 866, 876 (S.D. Tex. 2007).  But "constructive knowledge," or "what has become known as the ostrich type situation where an individual has 'buried [her] head in the sand' and failed to make simple inquiries which would alert [her] that false claims are being submitted" is sufficient.  *Id.* (quoting S. Rep. 99-345, at *21, 1986 U.S.C.C.A.N. 5266, 5286).

*Inter alia*, the jury could have seen Julie's execution of the management agreement between SCH and CMI, allowing CMI to charge SCH up to 15% of revenue, as an "affirmative act" that facilitated these false claims.  And the Government presented evidence that Julie did little to no work for SCH despite the salaries and fees she collected from Medicare.  The Government also presented evidence indicative of constructive knowledge, such as Julie's failure to inquire about the management fees ultimately charged by CMI.  Sufficient evidence supports the jury's verdict against Julie Cain.

## IV.

Should this court decline to reverse and render judgment for them, Appellants assert that the FCA's six-year statute of limitations applies to bar claims accruing before September 2009, such that the judgment should be reduced to $4,590,495.[12]  According to Appellants, "the relator's claims made no mention of [excessive] salaries or luxury cars," which they contend is the crux of the Government's intervening complaint, so that the Government's claims do not relate back to the filing date of Aldridge's complaint.  Appellants further argue that the FCA's tolling period does not

---

[12] September 2009 is six years prior to the Government's intervening complaint, filed in September 2015.

No. 21-60568
c/w No. 22-60145

apply because the Government failed to make a diligent investigation. The Government counters that its claims in fact relate back to Aldridge's "Medicare cost report fraud" claims, and even if not, the FCA's tolling provision salvage its claims *in toto*.

"[Q]uestions of law, such as whether the statute of limitations has run or whether equitable tolling applies," are reviewed *de novo*. *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir. 2008). But as to tolling, "[w]hether the Government should have reasonably discovered the alleged [actions] is a mixed question of law and fact that we review for clear error." *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 383–84 (5th Cir. 2017). Appellants, "as the party asserting the statute-of-limitations defense, [bear] the burden of proving limitations barred the Government's claims." *Id.* at 383.

The FCA's limitations provision states:

(b) A civil action under section 3730 may not be brought--

> (1) more than *6 years after the date on which the violation of section 3729 is committed*, or

> (2) more than *3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances*, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

(c) If the Government elects to intervene . . . the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) *to clarify or add detail* to the claims in which the Government is intervening *and to add any additional claims* with respect to which the Government contends it is entitled to relief. For statute of

20

No. 21-60568
c/w No. 22-60145

limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government *arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint* of that person.

31 U.S.C. § 3731 (emphasis added).

### A.    Relation Back

As under Federal Rule of Civil Procedure 15, "a new [FCA] claim or pleading will not relate back when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Vavra*, 848 F.3d at 382 (internal quotation marks and citation omitted). "[T]o relate back, a new claim must be 'tied to a common core of operative facts[.]'" *Id.* (quoting *Mayle v. Felix*, 545 U.S. 644, 664 (2005)).

Because our caselaw on this point is limited, Appellants refer to two out-of-circuit cases, *U.S. ex rel. Miller v. Bill Harbert International Construction, Inc.*, 608 F.3d 871 (D.C. Cir. 2010), and *U.S. ex rel. Bledsoe v. Community Health System, Inc.*, 501 F.3d 493 (6th Cir. 2007). In *Miller*, the D.C. Circuit vacated a district court's FCA judgment in part based on the statute of limitations. 608 F.3d at 882–83. The *Miller* court concluded that allegations concerning one contract did not fairly encompass two other contracts "because each contract is unique and no two involved the same 'conduct, transaction, or occurrence.'" *Id.* at 882. The court was not persuaded by the Government's argument that the use of "contracts" (plural) in the relator's original complaint was sufficient. "Allowing such broad and vague allegations to expand the range of permissible amendments after the limitation period has run would circumvent the statutory requirement in the FCA that the amendments 'arise out of the conduct, transactions, or occurrences' in the original complaint." *Id.*

21

In *Bledsoe*, the Sixth Circuit took an even narrower view. 501 F.3d at 516. There, the court found that though a relator's original complaint alleged improper billing under "Code 94799" for services related to "emergency room" and "02 Equip./Daily," the later amended allegations for improper billing *under the same code* for "call back" services did not relate back. *Id*. at 518. The court likewise did not consider the relator's general allegation of fraud "by miscoding and upcoding items billed to Medicare and Medicaid" sufficient to provide the defendants with adequate notice. *Id*. at 516, 523.

Here, unconvinced by Appellants' reading of the relation back doctrine grounded on *Miller* and *Bledsoe*, the district court instead surmised that the Fifth Circuit, via *Vavra*, attached a broader meaning to § 3731(c). Based on its reading of *Vavra*, the district court concluded that the Aldridge's general allegations regarding cost report fraud were sufficient for relation back because "the FCA allows the Government to add detail or clarify the claims on which it is intervening; and it . . . allows relation back even when the claim of the Government arises out of conduct the [r]elator 'attempted to set forth.'" Appellants contend that the district court erred. We agree.

*Vavra*'s focus was on whether the FCA's relation back provision could attach to other, non-FCA claims, which is not the issue here. 848 F.3d at 381–83. Even so, the *Vavra* panel did not construe § 3731(c) as broadly as the district court did here. Instead, our colleagues cautioned that their conclusion that § 3731(c) allowed the Government to allege non-FCA claims upon intervention was not a free pass to add such claims willy-nilly: "This is not to say that the Government may take advantage of Section 3731(c)'s relation-back provision by adding any claims (FCA or not) to any *qui tam* FCA complaint." *Id*. at 382. And *Vavra* reiterated that new claims must be tied to a common core of operative facts to relate back under § 3731(c). *Id*. By contrast, relation back is generally improper when, though a new pleading shares some elements in common with the original pleading, it faults the

defendant for conduct different than that alleged in the original complaint. *Miller*, 608 F.3d at 881. That is the scenario here.

Aldridge initially alleged that Appellants "falsified their claims by engaging in a number of practices including fraudulent cost reporting, inflating supply costs, manipulating the swing bed status of the hospitals controlled by [CMI] . . . , and improperly waiving co-payments and deductibles." Neither of Aldridge's complaints nor the Government's March 2010 notice letter to Appellants (summarizing the relator's allegations) made any mention of excessive salaries or luxury vehicles. By contrast, the Government's intervening complaint, though generally premised on fraudulent cost reporting, primarily alleged that Appellants "abused the special Medicare rules for Critical Access Hospitals by improperly claiming expenses for the Cains' excessive and unwarranted compensation for work not performed and for Ted Cain's personal luxury automobiles . . . ." Thus, the upshot of the Government's complaint was "to fault [Appellants] for conduct different from that" alleged by Aldridge. *Miller*, 608 F.3d at 881; *accord Vavra*, 848 F.3d at 382. Rather than "clarifying" or "adding detail" to the relator's initial allegations, the Government's intervening complaint set forth *new* ones. Those new claims do not relate back under § 3731(c) to the date of Aldridge's original complaint.

###### B.    *Tolling*

Relation back unavailing, we next address whether the FCA's tolling provision salvages the Government's pre-September 2009 claims. It does not.

To benefit from the tolling period, the Government must file suit within "3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United

No. 21-60568
c/w No. 22-60145

States charged with responsibility to act in the circumstances." 31 U.S.C. § 3731(b)(2). The Government must also have acted with due diligence to preserve its claim. *See Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) (denying tolling because "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence").

Appellants posit that the five-year period from the filing of Aldridge's initial complaint in May 2007 to September 2012, the earliest date the Government could concede knowledge of FCA violations but still benefit from the equitable tolling provision, "is far too long to claim diligence." Appellants assert that neither the Government nor its agent, the MAC, was diligent in investigating its claims. They contend that the MAC knew, or should have known, the facts supporting the Government's claims long before September 2012 because the MAC processed and reviewed Appellants' cost reports each year. They also contend the DOJ knew, or should have known, the facts supporting the Government's claims before then, given that the relator's initial complaint was filed in 2007 and given the Government's protracted and repeated requests for seal extensions while it investigated Appellants.[13] Finally, Appellants point to proof Aldridge produced after trial, in support of his fee petition, that his expert, Rob Church, had notified the DOJ about the salary issues by the fall of 2011.

The Government answers that the relevant "official of the United States charged with responsibility," as referenced in the FCA's statute of limitations, is the Attorney General or an authorized designee, not the MAC. The Government further responds that the cost reports provided to the

---

[13] Appellants also note that the Government's relation back contentions are inconsistent with its tolling contentions: "If [Appellants] should have surmised the Government was investigating excessive salaries in March 2010, then surely the Government *should have known* about its claims by then."

MAC could not have triggered notice "given the opaque cost reporting structure [Appellants] engineered for Ted Cain's compensation." And the Government deflects Appellants' assertions that the DOJ knew or should have known the facts supporting the Government's claims before September 2012 as "mere[] allegations," having, "as the district court concluded, . . . no reasonable basis." Similarly, the Government submits that Appellants' contentions regarding Church's post-trial declarations amount only to speculation.[14]

In its order denying Appellants' post-trial motions, the district court sided with the Government, concluding that though it was unnecessary to reach the statute of repose given the relation back of the Government's claims, it was "persuaded that at a minimum, the Government had ten years from the date of the violation within which to bring its Complaint." The district court noted that even if the MAC's auditor had realized the amount of Appellants' salaries and that knowledge could be imputed to the Government, the MAC "still could not have determined, from the documents submitted, that Ted Cain was not actually performing any substantive work." The court found that the Government's position, that it only became aware in December 2013 of Ted's CMI compensation and the amounts Medicare reimbursed SCH for his compensation, was "borne out by the evidence." Additionally, the district court found, "it was not until October 8, 2014, . . . that [the Government] learned Ted Cain had not performed any qualifying work eligible for reimbursement by Medicare." The district court thus concluded "the United States brought its lawsuit

---

[14] Appellants' counsel concededly characterize Church's contradictory declarations as "a train wreck" and acknowledge "[Church] doesn't have any specific recollection of what he did or did not do."

No. 21-60568
c/w No. 22-60145

within three years of the date it knew or should have known of the violations."

Regardless of whether the Attorney General, his authorized designee, or the MAC was the relevant "official of the United States" for the FCA's statute of limitations accrual, and irrespective of whether the MAC's knowledge could be imputed to the Government, the record does not show that the MAC was contemporaneously aware of Ted's lack of reimbursable work. However, whether the DOJ should have uncovered the basic facts material to the Government's claims during the five years between August 2007 and September 2012 is a different matter.

In particular, the Government's August 2011 memorandum to the district court in support of an extension of the seal period—a memo that remains sealed and thus unavailable to Appellants—indicates that, after reviewing documents from Appellants, an expert recommended intervention in the case.[15] This suggests not just that the Government "reasonably should have . . . known" "facts material to the right of action," § 3731(b)(2), but that it likely *did know* such facts by August 2011. And the Government offers no explanation for how, despite this knowledge, it was nonetheless diligent in investigating and asserting its claims. Contrary to the Government's assertion that it learned of the Cains' compensation issues only in 2013, the Government's August 2011 memorandum instead supports Appellants' "mere[] allegations" that the Government either knew or should have known of its basis to intervene before September 2012.

---

[15] It is unclear the expert to which the August 2011 memorandum refers. But Aldridge's expert, in his first post-trial declaration, averred that he provided information to the Government in the fall of 2011 regarding Appellants' salary issues, quite possibly corroborating the Government's August 2011 memorandum to the district court. *See infra* PART VII.

No. 21-60568
c/w No. 22-60145

Given that, the Government cannot invoke the FCA's tolling provision. Instead, the FCA's statute of limitations applies to bar the Government's claims against Appellants accruing before September 2009, six years prior to when the Government filed its first intervenor complaint, and the damages awarded against Appellants must be remitted accordingly.

## V.

Next, Appellants challenge the Government's repeated requests for extensions of the seal period—and the district court's granting of those extensions—as well as the Government's eight-year delay in intervening in this case. They urge that as a matter of law, eight years is too long to delay intervention, as "[t]here simply is no 'good cause' for such an extraordinary delay." Appellants contend that the district court abused its discretion by indulging the Government's serial requests—so much so that dismissal of the Government's intervening complaint is warranted. We agree that the Government's incessant delay in intervening is inexcusable, as is the Government's tactic of hiding behind its sealed extension memoranda in resisting Appellants' challenge on this score. And we lament that, faced with *eighteen* increasingly rote requests for extension of the seal period, the district court enabled the Government's gamesmanship. Nonetheless, we decline Appellants' invitation to dismiss the Government's complaint as sanction.

After the initial 60-day period during which a FCA *qui tam* complaint is sealed, 31 U.S.C. § 3730(b)(2), "[t]he Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal," *id.* § 3730(b)(3). Here, the Government made eighteen such requests, extending the seal period from 60 days to more than eight years. To support their argument that this constituted an abuse of the FCA's seal provisions, Appellants rely on three out-of-circuit district court opinions: *U.S. ex rel. Brasher v. Pentec Health, Inc.*, 338 F. Supp. 3d 396, 403 (E.D. Pa.

27

2018) ("Clearly, the statute does not condone the granting of extension requests routinely or that submissions in support thereof remain forever sealed."); *U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 912 F. Supp. 2d 618, 623 (E.D. Tenn. 2012) ("The length of time this case has remained under seal borders on the absurd."); *U.S. ex rel. Costa v. Baker & Taylor, Inc.*, 955 F. Supp. 1188, 1190 (N.D. Cal. 1997) ("The legislative history of the [FCA] makes abundantly clear that Congress did not intend that the [G]overnment should be allowed to prolong the period in which the file is sealed indefinitely.").

*Martin* is particularly persuasive in considering whether the seal period was abusively extended here. In *Martin*, the seal period was extended for a total of four years. 912 F. Supp. 2d at 623. Even after the parties agreed to unseal most of the record, the Government requested that certain documents, identifying cooperating witnesses, remain sealed. *Id.* at 622. The *Martin* court addressed the request, stating that "the Government ha[d] stretched the FCA's 'under-seal' requirement to its breaking point." *Id.* at 623. The court noted that "the primary purpose of the under-seal requirement is to permit the Government sufficient time in which it may ascertain the status quo and come to a decision as to whether it will intervene in the case filed by the relator." *Id.* (citation omitted). And "with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review, and decision." *Id.* at 625 (quoting S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289–90).

Addressing the facts, the *Martin* court did not censor its discontent. It found that the Government's actions—conducting unchecked discovery and attempting to settle with the defendant prior to intervening—were "indicative of significant overreach." *Id.* at 624; *see also Costa*, 955 F. Supp. at 1191 ("This practice of conducting one-sided discovery for months or years while the case is under seal . . . is not authorized by the FCA . . . .

No. 21-60568
c/w No. 22-60145

Congress enacted the seal provision to facilitate law enforcement, not to provide an extra bargaining chip in settlement negotiations."). Noting regret in granting successive extensions, the *Martin* court concluded that "the Government's stated reasons were insufficient bases on which to obtain [] interminable extensions" of the seal period, and "[t]o the extent that the Government alleged that the pre-intervention investigation was overly complex, that complexity was likely a product of the Government's own extra-statutory discovery efforts[.]" 912 F. Supp. 2d at 625.

To recount *Martin* is to describe the Government's conduct here. Only, it was twice as egregious in this case: Aldridge filed his *qui tam* complaint in May 2007 and an amended complaint in November 2009. Yet the Government delayed its intervention until September 2015, for *eight years* of "evaluation." That meant extensive unilateral discovery, document review, and deposition requests; expert analysis, which according to the Government's August 2011 seal extension memorandum, included a recommendation to intervene; and, via selective disclosure of the relator's complaint in 2010, pressure on Appellants to settle, "thereby avoiding protracted litigation." Of course, all this transpired with the acquiescence of the district court.

For its part, the Government offers three counterpoints to Appellants' challenge: (1) Appellants do not point to any prejudice from the extensions (and cannot do so because they had notice of the Government's allegations as early as 2010); (2) Congress did not provide courts with dismissal authority based on the length of the Government's investigation; and (3) the length of the investigation was due to the complexity of the case and Appellants' own discovery violations. The first is, to put it charitably, not meritorious, for the same reasons the Government loses on the statute of limitations issue; the third is readily disposed of on the same basis as discussed in *Martin*, 912 F. Supp. 2d at 625.

No. 21-60568
c/w No. 22-60145

The Government's second point is grounded upon *State Farm Fire & Insurance Company v. U.S. ex rel. Rigsby*, 580 U.S. 26 (2016). In *Rigsby*, the Supreme Court held that "the FCA has a number of provisions that do require, in express terms, the dismissal of a relator's action." 580 U.S. at 34. According to the Government, it follows that, "had Congress intended to require dismissal for a violation of the seal requirement, it would have [likewise] said so." *Id.*

Appellants reply, reasonably, that leaving the Government and the district court unchecked "cannot be the law." They view *Rigsby* as inapposite because the issue there was whether a seal violation (as opposed to abuse of the FCA's seal provision) required mandatory dismissal of a relator's complaint. 580 U.S. at 32–33. And unlike *Rigsby*, Appellants do not seek dismissal of the entire action but rather request dismissal of "the Government's complaint in intervention, allowing the relator to proceed on his original complaint if he so chooses."

We agree with Appellants that *Rigsby* does not dictate the outcome of this case, in which Appellants effectively request dismissal of the Government's complaint for failure to prosecute. Irrespective of the FCA's provisions requiring dismissal of claims in certain instances, "[t]he authority of a federal [] court to dismiss a plaintiff's action with prejudice because of [its] failure to prosecute cannot seriously be doubted." *Link v. Wabash R. Co.*, 370 U.S. 626, 629 (1962). But the district court here declined to exercise that authority, and Appellants fail to pinpoint when the court's cumulative indulgence of the Government's snail's pace rose to an abuse of discretion. More importantly, Appellants provide no precedent, and we are aware of none, where such an extraordinary sanction as dismissal has been awarded because of the Government's inexcusable delays in intervening in a relator's case. *Cf. Rigsby*, 580 U.S. at 37–38 (noting that lesser sanction short of dismissal may well be warranted where the FCA's seal provisions are

30

abused). We decline to break new ground today by granting such drastic relief. Nevertheless, because of its statute of limitations problems, discussed *supra* PART IV, the Government does not escape unscathed. The consequence of the Government's dilatory conduct is the reduction by over half of the judgment entered against Appellants. That should be consolation enough in this particular case.

## VI.

Appellants next attack certain evidentiary rulings by the district court. They contend that the court improperly excluded Kuluz's testimony on two points, depriving them of a fair trial: first, that he relied on the advice of an outside accountant to allocate Ted's salary directly to SCH, and second, that Ted contributed millions of dollars to keep SCH operating.

### A.    *Advice to Allocate Directly*

During trial, the district court prevented Kuluz from testifying as summarized in Appellants' briefing on appeal:

> Bill King—who prepared defendants' cost reports—advised Kuluz in 2005 to directly allocate a portion of Ted's salary to SCH because the pooled percentage understated the time Ted spent on SCH matters . . . . King recommended direct allocation, and Kuluz set the allocation percentage based on his knowledge of Cain's work for SCH.

Appellants challenge the district court's conclusion that this testimony would potentially confuse the jurors. They assert that Kuluz's testimony was "directly relevant to the FCA's scienter element" and "could have led jurors to a different finding on scienter, as it supports the point that [Appellants] may have made mistakes in their allocations, but they did not lie to CMS."

However, the district court excluded the subject testimony on multiple grounds, citing prejudice to the Government, lack of reliability, *and*

a likelihood of jury confusion. The Government argues that because Appellants do not challenge the district court's other reasons for excluding Kuluz's testimony, they have forfeited any such argument. *See Rollins*, 8 F.4th at 397 ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal."). Tellingly, Appellants do not assert otherwise in their reply.

Regardless, we perceive no abuse of discretion in the district court's ruling. As noted by the court in its post-trial order, King is now deceased and there is no other evidence corroborating that he advised Kuluz; Appellants did not previously disclose this testimony to the Government;[16] and even assuming King had advised Kuluz, Appellants presented no evidence that King knew the amount of time Ted actually spent working at SCH or the amount of Ted's salary that Kuluz allocated to SCH. These findings support the district court's ruling. Moreover, even assuming an abuse of discretion, any error was harmless because there was additional evidence showing Kuluz, also an accountant, acted knowingly and did not properly allocate the Cains' salaries given their lack of work for SCH. *See Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 168 (5th Cir. 2008) (applying harmless error analysis). This issue lacks merit.

## B.   *Ted's Contributions to SCH*

Appellants also contend "the district court wrongly barred Kuluz from describing Ted's substantial contributions to SCH, including over $4,000,000 in capital contributions and $18,000,000 in personal guarantees for hospital loans." Appellants assert this testimony would have refuted the

---

[16] Kuluz testified in his discovery deposition that he could not remember why he chose to allocate Ted's salary directly to SCH.

No. 21-60568
c/w No. 22-60145

Government's theme that a "greedy" Ted was diverting money from SCH to the hospital's detriment.

The Government counters that the district court did not abuse its discretion in excluding this testimony, and even if it did, the exclusion did not affect Appellants' substantial rights. According to the Government, the court correctly excluded this testimony based on the best evidence rule. The Government also contends that the testimony was properly excluded as irrelevant and prejudicial.

The district court addressed this evidentiary issue in its post-trial order. The court reasoned that exclusion of this testimony was justified because (1) Appellants did not produce or disclose these matters during discovery; (2) Kuluz could not produce the checks or documents to authenticate these transactions, though he stated that such documents existed; (3) Ted's investments into his business were irrelevant to this action, which solely concerned claims submitted to Medicare for reimbursement; and (4) the jury could have been confused by this information, thinking it entitled Ted to an offset or credit. "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *In re: Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 263 (5th Cir. 2022) (citation omitted). We discern neither in the district court's reasoning here.

## VII.

Appellants also contend the district court committed reversible error in denying their request for post-trial discovery. Following trial, on March 27, 2020, Aldridge filed a motion for attorney's fees and expenses. In support of his petition, he included a declaration and time sheets from his expert, Rob Church. In the declaration, Church attested to the following:

33

No. 21-60568
c/w No. 22-60145

> Exhibit B hereto accurately itemizes the time I actually spent, and the tasks I performed, in the course of my work concerning this case at the request of the [r]elator's attorneys.
>
> . . .
>
> Exhibit D hereto is a "power-point style" document which was created by me in October and November of 2011 as a result of my work in this case, and was used by [Aldridge's attorney] Cliff Johnson and DOJ Attorneys Tom Morris and Angela Williams in order to present the relevant facts to attorneys for the Defendants in this case in September 2011.[17]  Pages 9 and 10 of that document itemized for the participants in that meeting my findings as of that time about the salary amounts, paid to Ted Cain and Julie Cain, which had been allocated to [SCH]'s Medicare cost reports.

Church's appended timesheets indicate that he identified the compensation issue and discussed it with Aldridge's attorneys and the Government as early as February 2011.  The Government, by contrast, had responded to an interrogatory during pretrial discovery that it did not discover the Cains' salary issues until December 2013, when an expert uncovered it during an analysis of the cost reports.

Based on the conflicting accounts, Appellants filed a motion on May 5, 2020, to conduct post-trial discovery to determine when the Government became aware of the Cains' salary issues. On May 10, 2020, the district court entered judgment against Appellants.  Church filed a supplemental declaration on May 13, 2020, as part of Aldridge's rebuttal in support of his petition for attorneys' fees.  In the supplemental declaration, Church appeared to backtrack, stating "Mr. Johnson and I discussed the powerpoint

---

[17] The parties acknowledge that these dates appear to be inconsistent.

on November 11, 2011 . . . .  At no time did I email or mail any 'powerpoint' document to any DOJ attorney."

The district court denied Appellants' motion for post-trial discovery, explaining in a twelve-page order that Appellants provided no authority for withholding entry of judgment to allow Appellants to re-open discovery.[18] The district court analyzed the motion as a request for relief from the judgment based on newly discovered evidence. *See* FED. R. CIV. P. 60(b) ("[T]he court may relieve a party . . . from a final judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)[.]").

To prevail on a Rule 60(b) motion based on newly discovered evidence, a movant must demonstrate "(1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003)).  The district court concluded that Appellants had ample opportunity to explore this issue in discovery yet failed to show the requisite due diligence to merit relief from the judgment.  The court likewise concluded that Appellants failed to show the evidence was material.

We apply a highly deferential standard of review to discovery matters. "Our standard of review in [cases where a party seeks to reopen discovery] 'poses a high bar; a district court's discretion in discovery matters will not be disturbed ordinarily unless there are unusual circumstances showing a clear

---

[18] As noted above, the district court entered judgment prior to the conclusion of the briefing of Appellants' motion for discovery.

abuse.'" *In re Complaint of C.F. Bean, LLC*, 841 F.3d 365, 370 (5th Cir. 2016) (citing *Marathon Fin. Ins., RRG v. Ford Motor Co.*, 591 F.3d 458, 469 (5th Cir. 2009)); *see also Marathon*, 591 F.3d at 469 (providing we "will disregard a district court's discovery error unless that error affected the substantial rights of the parties" (internal quotation marks and citation omitted)).

Appellants contend the district court erred by denying post-trial discovery "into an obvious discrepancy between the Government's pre-trial claim not to have discovered the salary issues until December 2013 and the relator's post-trial proof that [his] expert advised the Government about the salary issues—in correspondence, telephone calls, and meetings—as early as February 2011." Appellants further argue the district court misapplied the law by applying Rule 60(b)(2) when they moved for discovery "after the verdict, but before judgment was entered." Appellants lastly assert that the district court's reasoning, i.e., Appellants' lack of diligence and the immateriality of the information sought, was incorrect.

The Government responds that the district court properly denied Appellants' request because the discovery was immaterial; Appellants forfeited the issue by failing to provide specific discovery requests; and Appellants were not diligent in "following-up on the interrogatory response despite 'ample opportunity' in pre-trial discovery or at trial." The Government also asserts that regardless of whether Rule 60 applied to Appellants' request, Appellants still fail to meet the "high bar" of "clear abuse" necessary to re-open discovery.

As discussed *supra*, there is evidence in the record—the Government's own sealed memorandum from August 2011—that seemingly corroborates Church's first version of events, i.e., that he shared information with the Government about the Cains' excessive salaries, well prior to September 2012. Given the importance of such evidence for the Appellants'

statute of limitations defense, it is somewhat incongruous for the district court to have foreclosed any chance to resolve the seeming contradictions in Church's declarations, particularly against the backdrop of the Government's own (sealed) statements. That said, we are also mindful of the highly deferential standard we apply in reviewing the district court's discovery rulings—particularly as to whether to reopen discovery.

It is not necessary for us to square this circle. The purpose of Appellants' request for post-trial discovery was plainly to flesh out evidence to support their statute of limitations defense. Because we have already determined that their defense is well-taken, the post-trial discovery sought by Appellants would only be redundant. We therefore decline to delve further into the issues related to the district court's discovery ruling.

## VIII.

In the consolidated appeal, No. 22-60145, Appellants also challenge the district court's March 14, 2022 order enjoining Appellants from transferring certain pieces of property. We lack jurisdiction to review the district court's order, which merely enforces a prior injunction, and therefore dismiss the appeal in the consolidated case.

Following the jury verdict, the district court entered a final judgment, holding Appellants jointly and severally liable to the United States for roughly $32 million. The judgment provided that "[t]he [c]ourt continues its [o]rder forbidding the defendants from transferring, dissipating, selling or disposing of any of their assets." The record does not contain the district court's previous order preventing dissipation of assets, as the district court apparently never issued a formal order doing so. Instead, it appears that the district court was referring to a directive during trial that the parties should "maintain the status quo with regard to all assets, that from this point on,

nothing [was] supposed to be done with any asset [that was] the subject of this particular hearing."

Almost two years after final judgment was entered, on March 2, 2022, the district court set a status conference. The conference was prompted by the Government's discovery that 400 North Beach Blvd., Bay St. Louis, Mississippi, a vacant lot held by HR Properties, LLC, was pending sale for roughly $2.7 million. The Government believed that this violated the district court's anti-dissipation injunction in the final judgment.

Appellants responded that because none of them owned the lot, it was not subject to the injunction the district court had put in place.[19] Appellants sought to cancel the status conference and have the Government file a motion seeking specific relief. The Government responded that a status conference was appropriate because, among other things, facts relating to the ownership of the subject property and the ownership and control of Ted Cain's various entities were still undisclosed as Appellants had resisted related discovery.

The district court required the Government to file a motion to enforce the final judgment and provided Appellants the opportunity to respond.[20] In the interim, the district court entered a temporary enforcement order, specifically enjoining Appellants "from transferring, selling, encumbering, or disposing of any of" a specific list of properties identified by the Government. This list included "all properties believed to be owned or managed by Ted

---

[19] Appellants also noted that the Government was not a party to the relator's debt collection action before the district court (No. 1:20-cv-321), wherein the relator alleged fraudulent transfers by Appellants, and that the Government's action, also alleging fraudulent transfers by Appellants, (No. 1:22-cv-11) was pending before another judge.

[20] The district court has not ruled on this motion.

No. 21-60568
c/w No. 22-60145

Cain and HTC Elite and its management company, HTC Enterprises,"[21] including the vacant lot at 400 North Beach Blvd. Appellants filed a notice of appeal the same day the order was entered.

Appellants make a straightforward argument: HR Properties holds the vacant lot and was not bound by the district court's initial judgment and injunction. Therefore, any order by the district court applying the injunction to assets held by HR Properties is an expansion of its preexisting injunction, requiring clearly stated grounds and sufficient notice to the affected parties. FED. R. CIV. P. 65(d)(1), (d)(2). Appellants also levy arguments that the Government violated Federal Rule of Civil Procedure 7 by not properly requesting this relief in a motion and that the Government failed to carry the heavy burden of proof for an injunction.

The Government asserts that this court lacks jurisdiction over the appeal. According to the Government, because the Cains own HR Properties, at least indirectly, the district court's March 14, 2022 order merely enforces a preexisting injunction, and no appellate jurisdiction can be asserted over such an order. *See* 28 U.S.C. § 1292(a)(1) ("[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions."). The Government is correct.

"We have refused [] to assert jurisdiction . . . if the district court's order merely enforces or interprets a previous injunction." *In re Seabulk Offshore, Ltd.*, 158 F.3d 897, 899 (5th Cir. 1998) (internal quotation marks and citations omitted). "[A] court has not modified an injunction when it simply implements an injunction according to its terms or designates

---

[21] HR Properties, LLC is owned by HTC Elite, LP and HTC Enterprises, LLC. Julie and HTC Enterprises are part owners of HTC Elite. And Ted and Julie together own 100% of HTC Enterprises.

procedures for enforcement without changing the command of the injunction." *In re Deepwater Horizon*, 793 F.3d 479, 491 (5th Cir. 2015) (internal quotations, brackets, and citation omitted). "Interpretation, then, is not modification." *Id.*

The district court's March 14, 2022 order merely enforces the court's preexisting injunction. Contrary to Appellants' frequent reference to "nonparties" in their briefing, the Cains in fact own, or control, the property in question, albeit through indirect corporate entities. At the end of the day, the only ownership interests beyond Ted's and Julie's in any of the relevant entities are held by trusts for the Cains' children—trusts that Ted controls.

The district court recognized this obfuscation as well. It stated in its March 14, 2022 order that

> Cain's companies are interwoven, with some held by holding companies, but if any companies are subject to Cain family control or ownership, this prohibition against dissipation applies to all of them. There is to be no change [in] the status of any of these properties. This court is not going to deal in sophistry. This court order applies if Ted Cain is in control, even if acting through a corporate structure, or in the role of a "manager."

Because the Cains own or manage every entity that has any share in the vacant lot, the vacant lot is plainly subject to the district court's May 2020 injunction.[22] Indeed, during trial, Appellants' counsel conceded that entities owned or directed by Ted were included in the district court's ongoing

---

[22] "It is axiomatic that that federal courts possess inherent power to enforce their judgments." *Thomas v. Hughes*, 27 F.4th 363, 368 (5th Cir. 2022) (internal brackets, quotation marks, and citation omitted); *see also Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 577 (5th Cir. 2005) ("District courts can enter injunctions as a means to enforce prior judgments.").

No. 21-60568
c/w No. 22-60145

injunction.[23]  This was also the district court's view.  In a June 7, 2022 order denying Appellants' request to stay the March 14, 2022 enforcement order, the district court stated, "the injunctive relief ordered by this court is not a new order, but is an order to enforce the injunction already in place as contained in the judgment of this court." *Aldridge on behalf of United States v. Corp. Mgmt. Inc.*, 2022 WL 2046105, at *4 (S.D. Miss. June 7, 2022).

Because we agree with the district court that the injunction is not new or modified, the consolidated appeal in case No. 22-60145 must be dismissed for lack of jurisdiction.

\* \* \*

As to appeal No. 21-60568, we AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

As to appeal No. 22-60145, we DISMISS for lack of jurisdiction.

---

[23] Counsel stated at trial, "Mr. Cain is absolutely a defendant in this suit, and you have full power over him, as the controlling member of these LLCs, to do whatever is necessary and proper . . . .  And given that Mr. Cain has the authority to direct these other entities, you could direct him to direct the other entities." *Accord Thomas*, 27 F.4th at 368–69 (approving order barring business owner "from *causing* [the entity] to effectuate any proscribed transfer indirectly that [owner] could not make directly").

No. 21-60568
c/w No. 22-60145

JAMES C. HO, *Circuit Judge*, dissenting in part:

I fully appreciate how my distinguished colleagues could reasonably conclude—as they do in Section IV of the majority opinion—that we should not allow the Government's subsequent complaint to relate back to the relator's original complaint for purposes of applying the statute of limitations.

I agree that it's a close question. At the end of the day, it amounts to a judgment call about what it means to present a claim that "arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person." 31 U.S.C. § 3731(c). *See also* FED. R. CIV. PROC. 15(c). As our court has observed, "determining when an amendment will relate back" can be "difficult." *FDIC v. Conner*, 20 F.3d 1376, 1386 (5th Cir. 1994). "Courts have eschewed mechanical tests for determining when relation back is appropriate." *Id.*

Given the circumstances presented here, relation back appears to be contemplated under our precedent. In *Conner*, for example, the original complaint involved "approv[ing] twenty-one specified loans to specified borrowers" that "allegedly caused the bank to lose in excess of $2.8 million." *Id.* at 1378. The agency later "sought to incorporate into the complaint charges that the defendants'[] allegedly wrongful conduct caused [the bank] to suffer losses from several loans that were not identified in the original complaint." *Id.* We held that "the amended complaint should relate back to the date of the original complaint." *Id.* at 1386. "The damage allegedly caused by the loans that the FDIC seeks to include in this case arose out of the same conduct as the damage caused by the twenty-one loans listed in the original complaint. The conduct identified in the original complaint that allegedly caused the defendants to approve the loans listed in that pleading also allegedly caused the defendants to approve the loans that the FDIC seeks

42

to include in this case through the amended complaint." *Id.* "The FDIC's amendment thus seeks to identify additional sources of damages that were caused by the same pattern of conduct identified in the original complaint." *Id.*

Accordingly, I would affirm and hold Defendants liable for pursuing federal reimbursement for luxury cars and compensation for work not performed. Defendants surely knew that luxury cars and excessive salaries are not, to quote the original complaint, "related to qualified services provided for the benefit of Medicare and Medicaid beneficiaries," but are instead "unallowable costs" "not reimbursable under . . . Medicare and Medicaid."